See also, 19 BR 523; 19 BR 834; 25 BR 781; 25 BR 790; 25 BR 796; 38 BR 829; 58 BR 153.

IT IS FURTHER ORDERED that no sanctions shall be imposed upon the trustee.

**In the Matter of GEORGIA STEEL, INC., d/b/a Eastern Crane & Equipment, d/b/a Plate Services, d/b/a Georgia Structurals, and d/b/a Quickwork, Debtor.**

**J. Coleman TIDWELL, Trustee, Plaintiff,**

v.

**BETHLEHEM STEEL CORPORATION, Defendant.**

**Bankruptcy No. 81–50966. Adv. No. 82–5428.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Dec. 31, 1985.

Theodore Brown, Jr. and Susan A. Cahoon, Kilpatrick & Cody, Atlanta, Ga., for trustee.

Walter H. Bush, Jr., Hansell & Post, Macon, Ga., for defendant.

## MEMORANDUM OPINION ON COMPLAINT TO AVOID PREFERENTIAL TRANSFERS

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

### STATEMENT OF THE CASE

On September 3, 1981, Georgia Steel, Inc., d/b/a Eastern Crane & Equipment, d/b/a Plate Services, d/b/a Georgia Structurals, and d/b/a Quickwork ("Debtor"), filed a petition in this Court under Chapter 11 of the Bankruptcy Code. On October 29, 1982, the Court converted Debtor's Chapter 11 case to Chapter 7 of the Bankruptcy Code, and appointed J. Coleman Tidwell as trustee ("Trustee").

Before the Court is the "Complaint to Avoid Preferential Transfers" filed by the Trustee on December 22, 1982. The complaint alleges that Bethlehem Steel Corporation ("Defendant") received preferential transfers in the amount of $130,892.20, and that the transfers are avoidable by the Trustee under section 547(b) of the Bankruptcy Code. 11 U.S.C.A. § 547(b) (West 1979).

The complaint came on for trial, and the Court, having considered the evidence presented at trial and the arguments and briefs of counsel, now publishes its findings of fact and conclusions of law.

## FINDINGS OF FACT

Prior to March of 1981, Mr. William Kurek, an officer of Debtor, met with Mr. Bruce Hunt, a district credit manager of Defendant, to discuss Debtor's purchasing of steel from Defendant. Mr. Hunt told Mr. Kurek that Defendant could not extend unsecured credit to Debtor. Mr. Kurek assured Mr. Hunt that Georgia's lien laws would protect Defendant from being unsecured. Defendant and Debtor subsequently reached an arrangement under which Debtor could purchase steel from Defendant for use in a job that Debtor had with Brown & Williamson Tobacco Company ("Brown & Williamson") in Macon, Georgia. Defendant agreed to a "pay-as-get-paid" arrangement, with a general understanding that Debtor would pay Defendant within fifty-five days from shipment.[1] Debtor agreed to pay interest on payments not made within thirty days of invoicing.

On March 3, 1981, Mr. Hunt sent a letter to Mr. Kurek confirming this arrangement. In the letter, Mr. Hunt stressed that Defendant was extending credit to Debtor "based on the job protection afforded to [Defendant] as a materialman to a subcontractor under the Mechanic's Lien Laws in the State of Georgia ..." and on Mr. Burke L. Slocumb, Jr.'s personal guaranty. Mr. Hunt also wrote that Defendant understood that Debtor would use the steel in the Brown & Williamson job located in Macon, Georgia.

Debtor ordered steel for the Brown & Williamson job from Defendant on February 13, 1981, with purchase order number 21–1869. To account for the steel supplied for this job, Defendant established a general account number for Debtor. All of the invoices Defendant sent to Debtor pertaining to the Brown & Williamson job carried this number, which was "00." Debtor received the Brown & Williamson steel from Defendant through a series of four shipments occurring on the following dates: April 2, 1981; April 8, 1981; April 15, 1981; and May 17, 1981. Defendant demanded payment for these shipments with invoices on April 6, 1981; April 10, 1981; April 20, 1981; and May 19, 1981.[2]

Debtor, after receiving the steel, fabricated it and delivered it to the Brown & Williamson job site. Debtor also fabricated steel received from other suppliers and used it in the Brown & Williamson job. Subsequently, Debtor submitted a series of applications for payment to Brown & Williamson.[3] Debtor broke down the payment requests into labor, material, sales/use tax, surety bond, and change order categories.

---

1. Defendant and Debtor arrived at the 55-day figure by allowing 10 days for the shipment of steel from Defendant to Debtor, 30 days for Debtor's fabrication of the steel, and 15 days for payment from Brown & Williamson to Debtor.

2. The following is a summary of Defendant's shipping dates, invoicing dates and numbers, and the amounts invoiced for the Brown & Williamson job:

| Shipment Date | Invoice Date & Number | Amount Invoiced |
|---|---|---|
| April 2, 1981 | April 6,1981 #104–00320 | $21,325.26 |
| April 8, 1981 | April 10, 1981 #104–0067 | $23,654.28 |
| April 15, 1981 | April 20, 1981 #104–01122–1/2 | $19,346.62 |
| April 15, 1981 | April 20, 1981 #104–01122–2/2 | $ 1,806.84 |
| May 17, 1981 | May 19, 1981 #104–02959 | $23,750.62 |
| April 2, 1981 April 8, 1981 interest charge for late payment) | June 12, 1981 #2801–50953 | $ 574.69 |
| April 15, 1981 (interest charge for late payment) | June 26, 1981 #2801–51155 | $ 337.15 |

3. The dates on which Debtor applied to Brown & Williamson for payment and the amounts requested were: May 15, 1981—$91,423.00; May 15, 1981—$46,793.00; June 9, 1981—$35,410.66; June 26, 1981—$35,756.34; August 7, 1981—$47,539.00 and $35,165.00; October 12,

Under the material category, Debtor made no specific reference to the steel supplied by Defendant. The amounts listed under this category reflect all of the steel supplied to the job, which therefore includes Defendant's steel and the steel of other suppliers.

Brown & Williamson paid Debtor for the amounts requested with checks made payable to Debtor.[4] Brown & Williamson did not direct that a specific portion of the checks be paid to or held by Debtor in trust for Defendant, and Debtor's bank statements show that Debtor did not set aside special funds from the Brown & Williamson deposits with which to pay Defendant. Instead, Debtor deposited the checks into its general banking account. The bank statements show that Debtor's balance fluctuated with general deposits and withdrawals during the period, and that on some occasions, Debtor's account was overdrawn.[5]

When Debtor paid Defendant for the steel that it received from Defendant for the Brown & Williamson job, it paid Defendant as follows:

| Check Number and Date | Amount | For Shipment | Date Bank Paid Check |
|---|---|---|---|
| #57166 June 6, 1981 | $21,325.26 | April 2, 1981 | June 11, 1981 |
| #57167 June 10, 1981 | $23,654.28 | April 8, 1981 | June 15, 1981 |
| #57384 June 19, 1981 | $20,433.46 | April 15, 1981 | July 6 or 7, 1981 |
| #57594 July 3, 1981 | $ 674.69 | Interest charges on April 6, and 10, 1981, invoices | July 15, 1981 |
| #57740 July 16, 1981 | $23,750.62 | May 17, 1981 | July 22 or 23, 1981 |
| #57869 July 27, 1981 | $ 647.23 | Interest charges on April 20, 1981, invoice | August 14, 1981 |

Debtor's June, July, and August 1981 bank statements evidenced these payments. Upon receipt of Debtor's payments on the Brown & Williamson job, Defendant properly credited Debtor's "00" account.

1981—$30,487.00; November 3, 1981—$51,123.00; and December 28, 1981—$23,023.00.

4. The parties stipulate to the amount of the checks Brown & Williamson paid Debtor and to the dates Debtor deposited these checks into its general banking account. Pursuant to Debtor's applications for payments, Brown & Williamson made payments to Debtor as follows:

| Date | Check Number | Amount | Date Debtor Deposited |
|---|---|---|---|
| May 19, 1981 | #06541 | $138,216.00 | May 20, 1981 |
| June 16, 1981 | #07415 | $ 35,410.66 | June 18, 1981 |

Defendant's agent signed a statement[6] on September 25, 1981, which stated that for consideration, it waived and released its right to attach liens to the Brown & Williamson property under Georgia law.

| Date | Check Number | Amount | Date Debtor Deposited |
|---|---|---|---|
| July 2, 1981 | #07467 | $ 35,756.34 | July 6, 1981 |
| August 11, 1981 | #07476 | $ 82,704.00 | August 12, 1981 |
| November 9, 1981 | #26429 | $ 51,123.00 | ------------------- |
| January 4, 1982 | #36066 | $ 23,023.00 | ------------------- |

5. Debtor had overdrafts on its account on June 24, 1981, and August 10, 17, 18, 26, 27, and 31, 1981.

6. The statement provided that for consideration, "the receipt of which is hereby acknowledged, [Defendant] does hereby waive and release any

Brown & Williamson required such statements from all of Debtor's materialmen before it would make final payment to Debtor. On December 16, 1981, Debtor's agent signed a "Contractor's Affidavit of Payment of Debts and Claims" and a "Contractor's Affidavit of Release of Liens." Both affidavits contain clauses stating that Debtor had "paid in full or has otherwise satisfied all obligations for all materials and equipment furnished, for all work, labor, and services performed, ... for which [Brown & Williamson] might be held responsible." Before Debtor's agent signed the affidavits, Defendant received payment on all of its invoices except for approximately $300 of interest. After these affidavits were submitted to Brown & Williamson, Brown & Williamson made its final payment to Debtor on January 4, 1982.

Defendant also supplied steel to Debtor on another job; this one being for Engelhard Minerals and Chemicals Corporation ("Engelhard"), under purchase order number 22–1904.[7] On June 4, 1981, Debtor granted to Defendant a purchase-money security interest in the steel that Debtor ordered from Defendant for the Engelhard job.[8] On June 8, 1981, Defendant notified prior secured parties of Debtor that it would be taking a purchase-money security interest in the steel it supplied to Debtor for the Engelhard job. Defendant filed two financing statements to perfect Defendant's security interest in the steel purchased under order number 22–1904. One was filed on June 18, 1981, in Bibb County, Georgia, and the other was filed on June 22, 1981, in Wilkinson County, Georgia.[9]

On June 30, 1981, Defendant shipped steel to Debtor for use in the Engelhard job and demanded payment from Debtor in the amount of $40,406.66.[10] Debtor received the shipment from Defendant either on July 6 or 7, 1981. Debtor paid Defendant $40,406.66 with a check dated July 31, 1981, and Debtor's bank paid this check either on August 20 or 21, 1981. Defendant assigned account number "01" to the Engelhard shipment and properly credited that account with the payment.

## CONCLUSIONS OF LAW

The Trustee seeks to avoid Debtor's payments to Defendant, totaling $130,-892.20, as preferential transfers under section 547(b) of the Bankruptcy Code.[11] This amount represents payments to Defendant of $40,406.66 on the Engelhard job and of $90,485.54 on the Brown & Williamson job. Because Defendant raises different arguments relating to the two jobs, the Court will examine each separately.

The Court first will examine Debtor's payment to Defendant on the Engelhard job. The Trustee concedes that if the Court finds that Defendant has a properly perfected purchase-money security interest

---

and all liens, claims or rights of lien on or against said construction or improvement under the laws of the State of Georgia for and on account of labor or material or both furnished by the undersigned to the Buyer and used or intended for use in said construction or improvement."

7. The parties stipulate that Debtor placed this order with Defendant some time prior to June 30, 1981.

8. The purchase-money security interest covered the following collateral: "steel plate inventory, and the benefits and proceeds received or due from the use thereof, work in process, and finished goods, derived from shipments by Bethlehem Steel Corporation under Georgia Steel,

Inc.'s purchase order 22–1904 approximating 80 tons."

9. The financing statements contain a description of the goods identical to the description in the June 4, 1981, security agreement. In addition, the financing statements state that the "[c]ollateral may be located on premises of Engelhard Minerals and Chemical Corporation, McIntyre, G[eorgia]." The financing statements cover the proceeds and products of the collateral.

10. Defendant established the specific account number of "01" for payment on the Engelhard job.

11. 11 U.S.C.A. § 547(b) (West 1979).

in the Engelhard steel, the payment is not preferential and Defendant is entitled to retain the payment. The question for the Court, therefore, is whether Defendant has a properly perfected purchase-money security interest covering the Engelhard steel. Defendant must prove that its security interest attached and that it took all of the steps necessary to perfect its security interest if it is to prevail against the Trustee.[12]

In order for a security interest to attach, the following requirements must occur: There must be a written security agreement signed by the debtor; the security agreement must describe the collateral; the secured party must have given value; and the debtor must have rights in the collateral. O.C.G.A. § 11-9-203(1)-(2) (Michie 1982). The evidence shows that Defendant and Debtor executed a written security agreement on June 4, 1981. Debtor signed the security agreement, which contained a description of the collateral. The other requirements of section 11-9-203(1) of the Georgia Code were met by July 7, 1981, the date Debtor received the shipment of Engelhard steel. The security interest, therefore, attached no later than July 7, 1981.

The evidence also shows that Defendant took the steps necessary to perfect its purchase-money security interest. As required by Georgia law,[13] Defendant sent timely notice to the holders of prior security interests notifying them that Defendant was taking a purchase-money security interest in the Engelhard steel. Pursuant to section 11-9-401 of the Georgia Code,[14] Defendant also filed two financing statements on its security interests. It filed the first one on June 18, 1981, in Bibb County, Georgia, and the second one on June 22, 1981, in Wilkinson County, Georgia.

If the steps necessary for perfection are taken before the security interest attaches, the security interest is perfected at the time when it attaches. O.C.G.A. § 11-9-303(1) (Michie 1982). Attachment of the security interest occurred by July 7, 1981, the date Debtor received the Engelhard steel. All of the steps to perfect the security interest had been taken before this date; therefore, the security interest was perfected on this date. *See Enterprises Now, Inc. v. Citizens & Southern Development Corp.*, 135 Ga.App. 602, 603, 218 S.E.2d 309, 311 (1975). The Court concludes that Defendant had a properly perfected purchase-money security interest in the Engelhard steel, and Defendant is entitled to retain Debtor's payment of $40,406.66 on the Engelhard account.

█ The Court next will examine the payments [15] Defendant received for steel supplied to Debtor for the Brown & Williamson job. The Trustee seeks to avoid these payments as preferential transfers under section 547(b) of the Bankruptcy Code. Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

---

**12.** The Georgia Code provides that "[a] security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken...." O.C.G.A. § 11-9-303(1) (Michie 1982).

**13.** O.C.G.A. § 11-9-312(3) (Michie 1982).

**14.** *See* O.C.G.A. § 11-9-401 (Michie 1982). *See also, Food Serv. Equip. Co. v. First Nat'l Bank of Atlanta*, 121 Ga.App. 421, 422, 174 S.E.2d 216, 218 (1970).

**15.** Defendant received $90,485.54 in six payments from Debtor for the Brown & Williamson job. *See supra* p. 4.

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 1979). A trustee, who seeks to avoid a transfer under section 547(b), has the burden of proving the existence of these elements. *See Tidwell v. Fickling & Walker Insurance Agency, Inc. (In re Georgia Steel, Inc.),* 58 B.R. 153, 156 n. 4 (Bankr.M.D.Ga.1984) (citing *Meyers v. Vermont National Bank (In re The Music House, Inc.),* 11 B.R. 139, 7 Bankr.Ct.Dec. 882, 5 Collier Bankr.Cas.2d 1240 (Bankr.D.Vt.1980)).[16]

For a trustee to avoid a transfer under section 547(b), the property transferred must be "property of the debtor." [17] 11 U.S.C.A. § 547(b) (West 1979); *see also* 11 U.S.C.A. § 547(e)(3) (West 1979).[18] Defendant asserts that the funds Brown & Williamson paid to Debtor for what was designated in Debtor's billing as "material" were trust funds held by Debtor for the benefit of Defendant and therefore not property of Debtor's estate. The Trustee asserts that Georgia law does not provide for a trust fund under such circumstances, and even if it did, the funds are subject to the lowest intermediate balance rule.

To determine whether the payments were property of Debtor's estate, the Court must determine whether the funds paid to Debtor from Brown & Williamson were imposed with a trust for the benefit of Defendant under Georgia law.[19] The Georgia Legislature, unlike some other state legislatures,[20] has not adopted a state statute expressly imposing a trust for the benefit of a materialman upon funds received by a contractor from an owner of

**16.** *See* Bankruptcy Amendments and Federal Judgeship Act, Pub.L. No. 98–353, Title III, Subtitle H, § 462, 98 Stat. 333, 378 (1984).

**17.** *See* 4 Collier on Bankruptcy ¶ 547.08[2] (15th ed. 1985).

**18.** This section provides that for the purposes of section 547, "a transfer is not made until the debtor has acquired rights in the property transferred." 11 U.S.C.A. § 547(e)(3) (West 1979).

**19.** *See In re D & B Elec., Inc.,* 4 B.R. 263, 269 (Bankr.W.D.Ky.1980) (courts must interpret state law and not make it). Bankruptcy courts must look to the law of the appropriate state regarding the existence, nature, requirements, and priorities of state law when the issue involved in the bankruptcy proceeding is one derived from state law. *In re Hull,* 19 B.R. 501, 507 (Bankr.N.D.Ind.1982). Whether the funds in the hands of a contractor are held in trust for the benefit of a subcontractor is an issue governed by state law.

**20.** In support of its position, Defendant cites to the Court cases from other jurisdictions holding that funds which a debtor-contractor received from an owner were trust funds held for the benefit of a subcontractor and therefore were not "property of the debtor" under section

547(b). *See Aab v. Wesco Corp. (In re Casco),* 28 B.R. 191, 10 Bankr.Ct.Dec. 178 (Bankr.E.D.N.Y. 1983); *accord, Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979); *Parker v. Klochko Equip. Rental Co.,* 590 F.2d 649 (6th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979); *Carrier Corp. v. J.E. Schecter Corp.,* 347 F.2d 153 (2d Cir.), *cert. denied,* 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965); *In re H.G. Prizant & Co.,* 257 F.Supp. 145 (N.D.Ill.1965). The Court finds these cases inapplicable because in them there were state statutes *expressly* creating such trust funds for the benefit of a subcontractor. The courts concluded that the legislative history of the Bankruptcy Code suggested that trust funds created by state statute were not property of the debtor's estate. For examples of such statutes, see N.Y.Lien Law §§ 70–79a (McKinney 1966 & Supp.1984–85) and Mich.Comp.Laws Ann. § 570.151 (1967).

Defendant also cites to the case of *In re D & B Elec., Inc.,* 4 B.R. 263 (Bankr.W.D.Ky.1980). In that case, the court held that funds a contractor received were held for the benefit of a subcontractor in a trust fund even though Kentucky did not have a state statute expressly creating trust funds in such a situation. *Id.* at 270. The Court finds this case inapplicable because the Kentucky court based its decision on Kentucky law and the construction of that law by Kentucky's judicial branch.

improved real estate. As recognized by the United States District Court for the Northern District of Georgia in *Mullins v. Noland Co.*,[21] Georgia courts also have not addressed the question of whether a general contractor holds funds received from an owner in trust for the benefit of subcontractors and materialmen. 406 F.Supp. at 213. Georgia courts have only recognized "a substantial obligation on the part of general contractors to ensure that all subcontractors and their materialmen are paid." *Id.*[22]

Defendant cites the Court to cases in which it asserts that Georgia courts have recognized a trust fund theory. In *Short & Paulk Supply Co. v. Dykes*,[23] the issue before the Georgia Court of Appeals was whether the trial court properly granted summary judgment to an owner of property on which materialmen had claimed materialman's liens. The court held that summary judgment was improperly granted to the owner because there was an issue of fact concerning the contractor's credibility which should be resolved. In arriving at this decision, the court in dictum stated:

"If [the contractor] received the full contract price for the job he became a *trustee of the funds* for the purpose of disbursing them properly to those who held valid claims for labor and materials, and his failure faithfully to do so would render him *criminally* liable."

120 Ga.App. at 646–47, 171 S.E.2d at 788 (emphasis added). Another case Defendant cites in support of its argument is *Johnson*

---

*v. State*, 203 Ga. 147, 45 S.E.2d 616 (1947). In that case, the court addressed the question of a contractor's *criminal* liability under Georgia law for fraudulent conversion of funds and building materials entrusted to him.

■■ The Court concludes that neither of these cases is controlling on the issue before the Court. While both the Georgia Legislature and the judiciary have addressed the issue of a contractor's *criminal liability* regarding funds received from an owner of improved real estate, neither branch has addressed specifically the issue of whether a *civil trust* is imposed on funds received by a contractor for the benefit of a materialman. As a federal court, this Court is bound by the laws of the state in which it sits when it applies that state's laws, and it must not judicially legislate matters which the state has not addressed. *See In re D & B Electric, Inc.*, 4 B.R. 263, 269 (Bankr.W.D.Ky.1980).[24] Because of this, the Court declines to hold that the payments received by Debtor from Brown & Williamson were imposed with a trust for the benefit of Defendant.[25]

■ Section 547(b)(1) requires the transfers to be "to or for the benefit of a creditor." 11 U.S.C.A. § 547(b)(1) (West 1979). The Code defines "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor...." 11 U.S. C.A. § 101(9)(A) (West 1979). Defendant had a claim[26] against Debtor for steel de-

---

**21.** 406 F.Supp. 206 (N.D.Ga.1975).

**22.** In support of this proposition, the district court cites to two Georgia Court of Appeals cases. *See Short & Paulk Supply Co. v. Dykes,* 120 Ga.App. 639, 171 S.E.2d 782 (1969); *Scott v. Williams,* 111 Ga.App. 735, 143 S.E.2d 16 (1965).

**23.** 120 Ga.App. 639, 171 S.E.2d 782 (1969).

**24.** The Court notes that Georgia courts have stated the following principle as applicable when lien laws are involved: "[I]nasmuch as our lien laws and procedures are in derogation of the common law, they must be *construed strictly against the creditor* and in favor of the debtor." *Dixie Concrete Serv., Inc. v. Life Ins. Co. of Georgia,* 174 Ga.App. 866, 866, 331 S.E.2d

889, 890 (1985) (citations omitted) (emphasis added).

**25.** A Tennessee bankruptcy court properly declined to hold that construction proceeds paid to a contractor were trust funds because Tennessee law did not impose such a trust. *See Weill v. Evans Lumber Co. (In re Johnson),* 25 B.R. 889, 897 (Bankr.E.D.Tenn.1982). Because the Court concludes that the funds were not trust funds, the issue of whether the funds are subject to the lowest intermediate balance rule is not reached.

**26.** In section 101(4), "claim" is defined as: "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, dis-

livered that arose before Debtor's petition was filed and thus Defendant was a creditor of Debtor.

■ Under the second element of a preferential transfer, the Trustee must prove that the transfer was made "for or on account of an antecedent debt." [27] Debtor incurred debt to Defendant at the time that Defendant shipped steel to Debtor because Debtor obtained a special property interest in the steel at that time. *Trauner v. Stephenson Associates, Inc. (In re Valles Mechanical Industries, Inc.)*, 20 B.R. 350, 352–53, 9 Bankr.Ct.Dec. 334, 335, 6 Collier Bankr.Cas.2d 859, 861 (Bankr.N.D.Ga. 1982). The steel was shipped on April 2, 8, and 15, 1981, and May 17, 1981. [28] Debtor did not pay for these shipments until June, July, and August of 1981, therefore, these payments were made for or on account of an antecedent debt. Because of Debtor's late payments for these shipments, Defendant charged Debtor interest. Debtor paid the interest charges approximately one month after invoicing. The Court concludes that these payments also were made for or on account of an antecedent debt.

■ The third preferential element that the Trustee must prove is that Debtor was insolvent at the time of the transfers. 11 U.S.C.A. § 547(b)(3) (West 1979). As evidence of Debtor's insolvency, the Trustee enjoys the statutory presumption of insolvency contained in section 547(f), which provides: "For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C.A. § 547(f) (West 1979). The parties stipulate that the evidence presented in *Tidwell v. Fickling & Walker Insurance Agency, Inc. (In re Georgia Steel, Inc.)* [29] is binding on the

issue of insolvency in this adversary proceeding. In *Fickling & Walker*, this Court found that Debtor was insolvent at the time of the transfers to Fickling & Walker on July 15 or 16, 1981, and August 14 or 18, 1981. This Court based its finding on the testimony of Debtor's former president that Debtor's original schedules were not accurate, and that Debtor's liabilities actually exceeded its assets at the time of the filing of the schedules. [30] Defendant has presented no additional evidence on Debtor's financial condition to place in question the Court's finding in *Fickling & Walker*. The Court, therefore, concludes that at the time Debtor made the transfers to Defendant, Debtor was insolvent.

■ Under the fourth element of a preferential transfer, the Trustee must prove that Debtor made the transfers within the preferential period. 11 U.S.C.A. § 547(b)(4) (West 1979). Debtor filed its bankruptcy petition on September 3, 1981; therefore, the ninety-day preference period began on June 5, 1981. To determine when Debtor made the transfers involved in this adversary proceeding, the Court must look at the date when the drawee bank honored the checks with which Debtor paid Defendant. *Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*, 38 B.R. 829, 832, 11 Bankr.Ct.Dec. 1163, 1165 (Bankr.M.D.Ga. 1984); *Harris v. Harbin Lumber Co. of Royston (In re Ellison )*, 31 B.R. 545 (Bankr.M.D.Ga.1983). *See also Nicholson v. First Investment Co.*, 705 F.2d 410, 413 (11th Cir.1983); *Artesani v. Travco Plastics Co. (In re Super Market Distributors Corp.)*, 25 B.R. 63, 64–65, 9 Bankr.Ct.Dec. 1155, 1156 (Bankr.D.Mass.1982); *Itule v. Luhr Jensen & Sons, Inc. (In re Sportsco, Inc.)*, 12 B.R. 34, 35–36, 7 Bankr.Ct.Dec.

---

puted, undisputed, legal, equitable, secured, or unsecured; ..." 11 U.S.C.A. § 101(4)(A) (West 1979).

**27.** 11 U.S.C.A. § 547(b)(2) (West 1979).

**28.** The evidence does not indicate the dates on which Debtor actually received the shipments, but there is testimony indicating that shipment from Defendant to Debtor took ten days.

**29.** 58 B.R. 153 (Bankr.M.D.Ga.1984).

**30.** 58 B.R. 153, 156. The amended schedules of Debtor filed on January 31, 1983, show that Debtor had debts of $5,840,706.27 and assets of $2,654.13. *Id.*, at 156 n. 5.

1025, 1025–26 (Bankr.D.Ariz.1981). Debtor's bank, the drawee bank, honored all of the checks made payable to Defendant after June 5, 1981,[31] so the Court concludes that the transfers occurred within the preferential period of section 547(b)(4).

■ The parties stipulate that the evidence presented in *Fickling & Walker* concerning section 547(b)(5) is also binding in this adversary proceeding. In that adversary proceeding, the trustee testified that a 100% distribution in Debtor's bankruptcy case was not possible because there were potential assets of $1,600,000 to pay claims of approximately $5,000,000. Based upon this evidence, this Court concluded that the trustee met his burden of proof under section 547(b)(5) because Fickling & Walker was an unsecured creditor that received 100% payment on its debt prior to bankruptcy when the ultimate distribution in Debtor's bankruptcy case would be less than 100%. *See Barash v. Public Finance Corp.*, 658 F.2d 504, 508–09 (7th Cir.1981); *Rovzar v. Chemical Sales & Service Co. (In re Saco Local Development Corp.)*, 30 B.R. 862, 865–66 (Bankr.D.Me.1983). Defendant has presented no additional evidence to dispute the ultimate distribution figure; therefore, the Court concludes that the Trustee has met his burden of proof under section 547(b)(5).

Having concluded that the transfers are preferential under section 547(b), the Court now decides whether the transfers are excepted from section 547(b) under the provisions of section 547(c).[32] Defendant asserts that the exceptions found in subsections (c)(1), (2), and (4) apply in this adversary proceeding. These subsections provide:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms; [33]

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise

---

**31.** Debtor's bank honored Debtor's checks to Defendant on the following dates: #57166, June 11, 1981; #57167, June 15, 1981; #57384, July 6 or 7, 1981; #57594, July 15, 1981; #57740, July 22 or 23, 1981; and #57869, August 14, 1981.

**32.** 11 U.S.C.A. § 547(c) (West 1979).

**33.** The Court notes that subsection (c)(2) was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, and now states:
(2) to the extent that such transfer was—
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms; ...
11 U.S.C.A. § 547(c)(2) (West Supp.1985). *See* Bankruptcy Amendments and Federal Judgeship Act, Pub.L. No. 98–353, Title III, Subtitle A, § 462, 98 Stat. 333, 378 (1984). Since this adversary proceeding was pending at the time of enactment of the new law, it is governed by the old subsection (c)(2), 11 U.S.C.A. § 547(c)(2) (West 1979).

**520**

unavoidable transfer to or for the benefit of such creditor; . . .

11 U.S.C.A. § 547(c)(1), (2), and (4) (West 1979).

Defendant first asserts that the transfers are exempted from section 547(b) by section 547(c)(1). This section provides an exception for transfers made to a creditor which are contemporaneous exchanges for new value given to a debtor. *See Plotkin v. Sunflower Beef Packers, Inc. (In re Hudson Quality Meats, Inc.)*, 29 B.R. 67, 77 (Bankr.N.D.N.Y.1982). Defendant asserts that the contemporaneous exchange exception is satisfied by Defendant's forbearance from filing a materialman's lien because Defendant received payment from Debtor. This assertion is based on the inchoate lien theory discussed in *Mullins v. Noland Co.*, 406 F.Supp. 206 (N.D.Ga. 1975), and other cases following that line of reasoning.[34] The Trustee argues that before Defendant's inchoate lien theory can be addressed, Defendant must satisfy the threshold issue of whether Defendant was entitled to the benefits of the Georgia materialman's lien statute. The Trustee argues that even if Defendant can satisfy the threshold issue, an inchoate lien theory is not available to Defendant in this adversary proceeding.

 The Court first addresses the threshold issue of whether Defendant was entitled to the benefits of the Georgia materialman's lien statute. In Georgia, the burden is upon Defendant, as the supplier of materials, to prove that the steel supplied was actually used in the Brown & Williamson job. *Sanford v. Hodges Builders Supply, Inc.*, 166 Ga.App. 86, 87, 303 S.E.2d 280, 282 (1983); *Bowen v. Collins*, 135 Ga.App. 221, 221, 217 S.E.2d 193, 194 (1975). If Defendant can show it shipped steel to Debtor under invoices designating the steel for a particular job, a presumption arises that the steel was actually used in the improvement of the real estate at the job site. *See Sanford*, 166 Ga.App. at 87, 303 S.E.2d at 282; *Horne-Wilson, Inc. v. Smith*, 109 Ga.App. 676, 678, 137 S.E.2d 356, 357–58 (1964). For the reasons stated below, the Court finds that Defendant has proven that it was entitled to the benefits of Georgia's materialman's lien statute.

The Trustee relies on the statement by the Georgia Court of Appeals in *Williams v. Willingham-Tift Lumber Co.*[35] in which the court discusses the responsibilities of a materialman in preserving his lien rights. 5 Ga.App. at 535–36, 63 S.E. at 585. While the *Williams* case supports the Trustee's argument, it is limited to its facts. *Dye v. Turner Concrete, Inc.*, 119 Ga.App. 78, 79, 166 S.E.2d 773, 775 (1969). *See also, Golsen v. Magbee Lumber Co.*, 126 Ga.App. 119, 121, 190 S.E.2d 104, 106 (1972). In applying the *Williams* holding, Georgia courts see if there is evidence showing that the payment by an owner to a contractor was misappropriated by a materialman to an account other than the owner's. *Dye*, 119 Ga.App. at 79, 166 S.E.2d at 775; *Golsen*, 126 Ga.App. at 121, 190 S.E.2d at 106. *See also* D. Hinkel, *Construction Mechanics' & Materialmen's Liens The Law in Georgia*, § 4–5 (1978).

The evidence presented in this adversary proceeding does not show that Defendant misappropriated any payments. In the regular course of business, Defendant assigned customer code numbers to Debtor's accounts so that payments on invoices could be credited properly to the particular job for which the steel was supplied.[36] At the time that Defendant assigned Debtor the general customer code number of "00,"

---

**34.** *See e.g., La Rose v. Crosby & Son Towing, Inc. (In re Dick Henley, Inc.)*, 38 B.R. 210, 10 Collier Bankr.Cas.2d 806 (Bankr.M.D.La.1984); *Bel Marin Driwall, Inc. v. Grover*, 470 F.2d 932 (9th Cir.1972); *Keenan Pipe & Supply Co. v. Shields*, 241 F.2d 486 (9th Cir.1956); *Greenblatt v. Utley*, 240 F.2d 243 (9th Cir.1956); *Jackson v. Flohr*, 227 F.2d 607 (9th Cir.1955); *cert. denied*, 350 U.S. 947, 76 S.Ct. 322, 100 L.Ed. 826 (1956).

**35.** 5 Ga.App. 533, 63 S.E. 584 (1909).

**36.** Defendant normally referred to a customer's general account with the numbers "00" and to specific job accounts with numbers other than "00."

Debtor had no other account with Defendant. Some months later, Debtor ordered steel from Defendant for the Engelhard job, and for this second job, Defendant assigned the specific customer code number "01." Because Debtor had only two jobs for which Defendant supplied steel, the general account number "00" effectively operated as a specific account number because the other account was labelled as "01." When Defendant sent invoices to Debtor, the invoices reflected the purchase order number [37] and the account number. The evidence shows that Defendant correctly credited the account on which Debtor intended to pay.

Because Defendant has satisfied the threshold issue, the Court will address whether necessary elements of section 547(c)(1) have been established. The three elements that must be present in order to satisfy section 547(c)(1) are: (1) that Defendant extended new value to Debtor, (2) that both Defendant and Debtor intended the new value and reciprocal transfer by Debtor to be contemporaneous, and (3) that the exchange was in fact contemporaneous. 11 U.S.C.A. § 547(c)(1) (West 1979). *See Kallen v. Litas,* 47 B.R. 977, 983 (Bankr.N. D.Ill.1985).

The first element Defendant must establish under section 547(c)(1) is that it extended new value to Debtor. Defendant asserts that it extended new value to Debtor by not exercising its statutory right under Georgia law to file a materialman's lien. In support of its argument, Defendant relies upon *Mullins v. Noland Co.,* 406 F.Supp. 206 (N.D.Ga.1975), and other cases [38] in which courts have held that a waiver of an inchoate lien in exchange for payment does not constitute a preferential payment.

In *Mullins v. Noland Co.,*[39] the general contractor issued checks jointly payable to a debtor-subcontractor and a materialman within the preference period. The materialman had contacted the general contractor directly and offered to waive its inchoate lien rights under Georgia law for payment by joint check from the general contractor. The existence of this inchoate lien right, coupled with the general contractor's obligation to ensure that all materialmen were paid, led the district court to conclude "that the subsequent payments from [the general contractor] to [the materialman] by means of the *joint checks* in issue did not constitute preferential payments...." *Mullins,* 406 F.Supp. at 210 (emphasis added).[40]

**37.** Debtor ordered materials supplied for the Brown & Williamson job with purchase order number 21–1869 and ordered materials supplied for the Engelhard job with purchase order number 22–1904.

**38.** *See, e.g., Bel Marin Driwall, Inc. v. Grover,* 470 F.2d 932 (9th Cir.1972) (court held that direct payments by a general contractor to a bankrupt's supplier, made under obligation of California law, were valid as setoffs under § 68b(2) of the Bankruptcy Act against a debtor's obligations to the bankrupt's estate); *Greenblatt v. Utley,* 240 F.2d 243 (9th Cir.1956) (court held that a transfer by a debtor, within four months of bankruptcy, to a creditor, with knowledge of the debtor's insolvency, made in discharge of a California inchoate mechanic's lien may not be avoided by the trustee as a preference within the meaning of § 60b of the Bankruptcy Act); *Jackson v. Flohr,* 227 F.2d 607 (9th Cir.1955), *cert. denied,* 350 U.S. 947, 76 S.Ct. 322, 100 L.Ed. 826 (1956) (court stated that the construction of the federal Bankruptcy Act was not involved in that case except insofar as the statutes of Washington adopted it as criteria of avoidable transfers).

**39.** 406 F.Supp. 206 (N.D.Ga.1975). *See also Keenan Pipe & Supply Co. v. Shields,* 241 F.2d 486 (9th Cir.1956). In *Keenan,* a principal contractor agreed to pay a materialman for materials it had furnished to a debtor-subcontractor with a check issued jointly to the materialman and debtor-subcontractor. In exchange for this payment, the materialman agreed to waive his right to file a statutory lien on the owner's property. Although this payment occurred within the preference period, the court held that the payments were not preferential because they were not made in consideration of a preexisting debt. 241 F.2d at 490.

**40.** The district court stated the issue for resolution as follows: "[W]hether the existence of the inchoate or unperfected lien, coupled with [the materialman's] forbearance from perfecting that lien *in light of the joint check arrangement* with [the general contractor], protects the payments made pursuant to that arrangement from attack by the Trustee as voidable preferences." *Mullins,* 406 F.Supp. at 210 (emphasis added).

The Court notes that the *Mullins* case is factually distinguishable from this adversary proceeding. In this adversary proceeding, Debtor was the contractor for the Brown & Williamson job and was not a subcontractor. Also, there was no agreement for payment by joint checks. The district court in *Mullins* did not discuss the issue of new value under section 547(c)(1). The court held only that the payments did not constitute a preferential transfer under the facts in that case.

■ The Court, having found no cases dealing directly with the issue of what constitutes new value, must determine whether Defendant's waiver of its inchoate lien rights in exchange for payment from Debtor constitutes "new value." For the purposes of section 547, the code defines "new value" in section 547(a)(2). This section provides:

> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, but does not include an obligation substituted for an existing obligation; ...

11 U.S.C.A. § 547(a)(2) (West 1979). "Congress defined 'new value' in its ordinary sense to avoid confusion and uncertainty." 4 Collier on Bankruptcy ¶ 547.05 (15th ed. 1985) (citing in footnote H.R.Rep. No. 595, 95th Cong., 1st Sess. 372, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6328 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 87, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5873 (1978). Congress carefully defined "new value" in section 547(a)(2), and the Court finds that Defendant's waiver of its inchoate lien rights does not fit within the definition of new value as set forth by Congress. The Court, therefore, must conclude that Defendant gave no new value to Debtor and therefore is not entitled to the section 547(c)(1) exception.

The Court recognizes the impact and the hardship that this decision may have on the construction industry in Georgia. *See Ballard v. Grubbs (In re Grubbs)*, 9 B.R. 499, 501 (M.D.Ga.1981). From a practical standpoint, even when a materialman receives full payment from a contractor, the materialman could be forced to file a claim of a materialman's lien within the ninety-day state statutory time limit or lose the protection of the lien laws in the event of a subsequent bankruptcy filing by the contractor. Despite this consequence, the function of this Court is to interpret the laws enacted by Congress. Congress has determined the order and priorities in the distribution of a bankrupt's estate through its enactment of the Bankruptcy Code. In this adversary proceeding, it is doubtful that Congress contemplated Defendant's situation and the resulting consequences, but it is up to Congress, not this Court, to correct this result. The impact of this decision also could be changed by the state legislature, which could adopt a specific trust fund statute and thereby remove payments, such as the ones Defendant received, from preferential attack under section 547(b).

■ The Court next will determine whether section 547(c)(2) is applicable. "To fall within section 547(c)(2), the payments must have been (1) made in payment of a debt incurred in the ordinary course of business of the debtor and transferee, (2) made not later than forty-five days after the debt was incurred, (3) made in the ordinary course of business of the debtor and the transferee, and (4) made according to ordinary business terms." *Flatau v. Marathon Oil Co. (In re Craig Oil Co.)*, 31 B.R. 402 at 405 (Adv.Proc. No. 82–5051) (Bankr.M.D.Ga.1983). The Court concludes that the checks were payments of debts incurred in the ordinary course of business of Debtor and Defendant, and that the payments were made in the ordinary course of Debtor's and Defendant's business. Debtor and Defendant reached an agreement under which Defendant would supply Debtor with steel, and they complied with the terms of the agreement. A

question remains of whether the payments were made within forty-five days of the debt being incurred.

The Bankruptcy Code does not state when a debt is incurred. The Code defines "debt" as a liability on a claim. 11 U.S. C.A. § 101(11) (West 1979).[41] The legislative history of this section reveals that its drafters intended to provide a broad definition of the word "claim." *Ohio v. Kovacs,* —— U.S. ——, 105 S.Ct. 705, 709, 83 L.Ed.2d 649 (1985).

■ "As a general rule, debts are incurred when the debtor becomes legally obligated to pay, not when the creditor bills the debtor. Generally, debts are incurred when goods are delivered or services performed." *Tidwell v. Fickling & Walker Insurance Agency, Inc. (In re Georgia Steel, Inc.),* 58 B.R. 153, 158 (Bankr. M.D.Ga.1984); *Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.),* 38 B.R. 829, at 835, 11 Bankr.Ct.Dec. 1163, 1166 (Bankr.M.D.Ga.1984).[42] The evidence in this adversary proceeding establishes that Defendant shipped the steel to Debtor on April 2, 8, 15, and May 17, 1981. Mr. Hunt testified that it would take ten days from the date of shipment for the steel to reach Debtor. From this testimony, the Court finds that Debtor received the ship-

ments on April 12, 18, 25, and May 27, 1981, respectively, and that on these dates, Debtor incurred debts within the meaning of section 547(c)(2). Since all payments for the shipments were made [43] more than forty-five days from these dates, [44] the Court concludes that section 547(c)(2) is not applicable.

A question remains, however, concerning when the debt was incurred with respect to the $1,321.92 in interest payments. This Court reaches the same conclusion as the Court of Appeals for the Eighth Circuit in *Iowa Premium Service Co. v. First National Bank (In re Iowa Premium Service Co.),* 695 F.2d 1109 (8th Cir.1982). That court held that "a debt for interest payments is incurred on the date upon which the obligor first becomes legally bound to pay that interest." 695 F.2d at 1112. The court found that date to be the date on which the interest began accruing. *Id.*[45]

■ The payment agreement between Debtor and Defendant provided that if Debtor did not pay an invoice within thirty days from the date it was sent to Debtor, Debtor would be charged interest. Debtor failed to timely pay the April 6, 10, and 20, 1981, invoices, so Defendant charged Debtor interest for late payments. Based upon

---

**41.** Claim is defined as follows:
"[C]laim" means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;
11 U.S.C.A. § 101(4) (West 1979).

**42.** *See also Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.),* 695 F.2d 833, 837 (5th Cir.1983); *Barash v. Public Fin. Corp.,* 658 F.2d 504, 509–10 (7th Cir.1981); *Trauner v. Stephenson Assocs., Inc. (In re Valles Mechanical Indus., Inc.),* 20 B.R. 350, 352–53, 9 Bankr.Ct.Dec. 334, 334–35, 6 Collier Bankr.Cas.2d 859, 861 (Bankr. N.D.Ga.1982).

**43.** For purposes of section 547(c)(2), payment is deemed made upon delivery of the check. *Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.),* 38 B.R. 829, 11 Bankr.Ct.Dec. 1163 (Bankr. M.D.Ga.1984).

**44.** *See supra* p. 6.

**45.** *Accord, Schmitt v. Equibank (In re R.A. Beck Builder, Inc.),* 34 B.R. 888, 893 (Bankr.W.D. Penn.1983); *Ford Motor Credit Co. v. Ken Gardner Ford Sales, Inc.,* 10 B.R. 632, 646–48 (Bankr. E.D.Tenn.1981). *Contra, Wickham v. United Am. Bank (In re Property Leasing & Management, Inc.),* 46 B.R. 903, 913–14, 12 Collier Bankr.Cas.2d 410, 421–22 (Bankr.E.D.Tenn. 1985) (A debt is incurred whenever the debtor obtains a property interest in the consideration exchanged, giving rise to the debt.).

the facts of this adversary proceeding, the Court finds that after the thirty-day period, Debtor became legally obligated to pay interest, and therefore Debtor incurred debt on May 7, 11, and 21, 1981. Debtor paid these charges within forty-five days after the interest accrued, and since it is an ordinary business term to charge interest on invoices not paid within thirty days, the interest payments are excepted from avoidance under section 547(c)(2).

Defendant finally argues that the transfers are exempt from section 547(b) under section 547(c)(4). Three requirements must be met before this section is applicable. First, the creditor must extend new value after the challenged transfer is made to him.[46] Second, the new value must be unsecured. Third, the new value must go unpaid. *See Pettigrew v. Trust Company Bank (In re Bishop),* 17 B.R. 180, 183, 8 Bankr.Ct.Dec. 852, 854–55, 5 Collier Bankr.Cas.2d 1515, 1519–20 (Bankr. N.D.Ga.1982); *Remes v. Yeomans (In re Quality Plastics, Inc.),* 41 B.R. 241, 242, 11 Collier Bankr.Cas.2d 163, 165 (Bankr.W.D. Mich.1984). The evidence in this adversary proceeding demonstrates that Defendant gave no new value after receiving the payments which the Trustee seeks to set aside as preferential transfers. Section 547(c)(4), therefore, is also inapplicable. *See La Rose v. Crosby & Son Towing, Inc. (In re Dick Henley, Inc.),* 38 B.R. 210, 214, 10 Collier Bankr.Cas.2d 806, 810 (Bankr.M.D. La.1984).

Accordingly, the Court holds that Defendant is entitled to retain the $40,406.66 received as payment from Debtor on the Engelhard job and is entitled to retain the $1,321,92 received as interest payments on the Brown & Williamson job. The Court holds that the $89,163.62 Debtor paid Defendant on the Brown & Williamson job constitutes a preferential transfer under section 547(b) of the Bankruptcy Code and therefore may be avoided.

**46.** *See supra* p. 28 for the definition of "new value."