In re **GEM CONSTRUCTION CORP. OF VIRGINIA, Debtor.**

**Sherman B. Lubman, Trustee, Plaintiff,**

v.

**C.A. Guard Masonry Contractor, Inc., Defendants.**

**Bankruptcy No. 98–33110–T. Adversary No. 99–3047.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Sept. 14, 2000.

Watson M. Marshall, Nicole L. Fox, Marshall and Marshall, Richmond, for C.A. Guard Masonry Contractor, Inc.

William A. Devan, Mezzullo & McCandlish, P.C., Richmond, for Stovall Associates, Inc.

Michael A. Condyles, Kutak Rock, Richmond, for Chapter 7 Trustee.

Gregg R. Nivala, Office of the United States Trustee, Richmond, Assistant United States Trustee.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Chief Judge.

The plaintiff, Sherman B. Lubman, chapter 7 trustee for the bankruptcy estate of GEM Construction Corporation of Virginia (GEM), filed a complaint against thirty defendants to avoid preferential payments pursuant to 11 U.S.C. § 547(b) and for judgment for the amount of the transfers against defendants pursuant to § 550. The only remaining issues for this court to decide are (1) whether the defen-

dants C.A. Guard Masonry Contractor, Inc. (C.A.Guard) and Stovall Associates, Inc. (Stovall) have met their respective burdens of proving that the payments they received are shielded from avoidance under "new value" exception of § 547(c)(1); and (2) whether C.A. Guard has met its burden of proving that the payment it received is protected from avoidance under "ordinary course of business" exception of § 547(c)(2).

For reasons stated in this memorandum opinion, the court will enter judgment against C.A. Guard pursuant to § 547(b) in the amount of the transfer. With respect to Stovall, the court will enter judgment against the trustee because the preferential transfer to Stovall meets the new value exception under § 547(c)(1).

### Findings of Fact.

Debtor GEM was a construction company that operated as a general contractor or subcontractor depending on the nature of the project. Defendants C.A. Guard and Stovall performed subcontract work for GEM.

On April 23, 1998, an involuntary chapter 7 bankruptcy petition was filed against GEM, and an order for relief was entered on May 15, 1998. Within ninety days prior to the filing of GEM's bankruptcy, GEM made several payments to its subcontractors. Among the transfers made by GEM was a payment to C.A. Guard in the amount of $21,209.06 and a payment to Stovall in the amount of $81,874.00.

### I. C.A. GUARD.

GEM's payment to C.A. Guard was for work performed on two separate construction projects. On one project, A.H. Robins, Inc., contracted with Suitt Construction for building renovation work. Suitt Construction subcontracted work on the

project to GEM, which in turn, subcontracted masonry work to C.A. Guard. On the other project, Investment Partners contracted with GEM for construction work at the Genito Mini Storage Facility. GEM also subcontracted masonry work on this project to C.A. Guard. Both projects were substantially completed by September 1997.

C.A. Guard and GEM had a long and enduring relationship, doing business together off and on for the last twenty years. C.A. Guard had never filed mechanics' liens on any job that it had with GEM until December 23, 1997, when it filed two mechanics' liens, one against property of A.H. Robins in the amount of $19,793.00, covering a portion of amounts billed by invoice dated July 22, 1997, and the other against property at the Genito Mini Storage Facility in the amount of $10,613.00, covering amounts billed by invoice dated October 24, 1997.

On December 23, 1997, the date the mechanics' liens were recorded, Suitt Construction owed GEM $715.69 under their contract. On that date, the amount A.H. Robins owed Suitt Construction on the A.H. Robins project is unknown, as is the amount, if any, Investment Partners owed GEM on the Genito project.

C.A. Guard did not file suit to enforce either lien and released both liens on January 6, 1998, based on GEM's promise to pay. GEM sent C.A. Guard a check in the amount of $21,209.06 dated January 21, 1998, which cleared debtor's bank account on January 23, 1998.[1] The transfer constituted payment of $11,199.69 on the A.H. Robins project and $10,009.37 on the Genito project.

---

1. The relevant date for preferential transfers by ordinary check is the date the check is honored, not the date it was issued. *See*

At the time of GEM's payment to C.A. Guard, Suitt Construction still owed GEM $715.69; however, the amount A.H. Robins owed Suitt Construction and the amount, if any, Investment Partners owed GEM are unknown.

## II. *STOVALL.*

GEM's payment to Stovall was for work performed on GEM's construction contract with Baptist Theological Seminary (BTS). Under the terms of the contract, BTS was authorized to retain and hold a percentage of payments on work in progress until final completion and acceptance of the work covered under the contract. GEM entered into a contract with Stovall, pursuant to which Stovall agreed to supply materials and labor in connection with interior storm windows and glazing work on the project. Stovall last performed work under this subcontract on November 19, 1997. No subcontractors other than Stovall were working on the project in November and December 1997 and January 1998.

As part of the general contract, GEM obtained a payment bond on the project from Markel Insurance Company (Markel) during 1996. As security, the bond contained a provision that stated that "funds earned by the contractor in the performance of the construction contract are dedicated to satisfy obligations of the contractor and the surety under [the] bond, subject to the owner's priority to use the funds for the completion of the work." Markel also received a general indemnity agreement signed by GEM and its principal, George Peterson, dated August 7, 1996.

On November 17, 1997, ten days after completing work on the site, Stovall sent a certified letter to Markel and BTS making

*Barnhill v. Johnson,* 503 U.S. 393, 399–400, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

a demand for payment under the bond. Negotiations ensued, culminating in a request by Markel and GEM to BTS asking that BTS make full payment to Stovall by check payable jointly to Stovall and GEM. On January 28, 1999, in response to this request, the owner paid Stovall $32,510.00 by check payable jointly to Stovall and GEM.[2]

On February 5, 1998, Stovall filed suit against GEM and Markel in the circuit court of the City of Richmond for the outstanding balance on its subcontract. GEM and Markel were served with notice of the suit on February 18, 1998, and February 17, 1998, respectively. On February 18, 1998, the same day that GEM received notice of the lawsuit, GEM delivered a check in the amount of $81,874.00 to Stovall for the full balance due under the subcontract, and Stovall contemporaneously executed a final lien waiver. Stovall also dismissed its case against GEM and Markel.

At the time of GEM's payment to Stovall, BTS owed GEM approximately $120,000.00, representing retainage under the general contract, and GEM owed its subcontractors approximately $254,832.08.

Additional findings of fact are stated in the conclusions of law section of this opinion.

**Discussion and Conclusions of Law.**

■ Bankruptcy Code § 547(b) permits a trustee to invalidate certain pre-bankruptcy transfers of a debtor, generally referred to as preferences. *See* 11 U.S.C. § 547(b); *see also Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1045 (4th Cir.1994). Property brought back into the estate under this section is shared by debtor's unsecured creditors on a pro rata basis. *See Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.),* 837 F.2d 224, 227 (5th Cir.1988).

Section 547(b) serves two congressional goals:[3]

First, the avoidance power promotes the "prime bankruptcy policy of equality of distribution among creditors" by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate. Second, the avoidance power discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor and offers a concurrent opportunity for the debtor to work out its financial difficulties in an atmosphere conducive to cooperation.

*Advo–System, Inc.,* 37 F.3d at 1047.

■ While § 547(b) implements Congress' twin goals, § 547(c) exempts prefer-

---

**2.** The trustee has not sought to avoid this payment as a preferential transfer. The court presumes this is because the earmarking doctrine would prevent this jointly payable check from becoming part of debtor's bankruptcy estate.

**3.** A House report explained the policy as follows:

> The purpose of the preference [§ 547(b)] section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the

debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among the creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 177–78, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6138.

ential transfers that do not further these purposes. *See In re Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d at 227. Thus, even if all the elements of § 547(b) are met, the preferential transfer will not be avoided if it falls within an exception under § 547(c).

The burden of proof for preferences is allocated to the parties by § 547(g) as follows:

> For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

This court has previously held by partial summary judgment that the trustee met his burden of proving GEM's payment of $21,209.06 to C.A. Guard and payment of $81,874.00 to Stovall constituted preferential payments under § 547(b). The issues the court must yet decide are whether the defendants have met their burden of proving that (1) the payments to C.A. Guard and Stovall are protected from avoidance under the "new value" exception of § 547(c)(1); and (2) the payment to C.A. Guard is protected under § 547(c)(2)'s "ordinary course of business" exception.

## I. *Section 547(c)(1) New Value Exception.*

Both C.A. Guard and Stovall assert that the payments they received are excepted from avoidance under § 547(c)(1), which provides as follows:

(c) The trustee may not avoid under this section a transfer—

(1) *to the extent that such transfer was—*

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange *for new value* given to the debtor; and

(B) in fact a substantially contemporaneous exchange; (emphasis added).

The term "new value" is defined for purposes of § 547 in subsection (a)(2), which states:

> "[n]ew value" means money or money's worth in goods, services or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.[4]

■■■ "This defense is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *In re Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d at 228 (internal quotation marks omitted); *accord* 1 David G. Epstein Et Al., Bankruptcy § 6–25, at 592 (1st ed.1992) (explaining that the primary justification for the new value exception is that a transfer of debtor's property is harmless if it does not deplete debtor's estate to the detriment of other creditors). Thus, for § 547(c)(1) to apply, the value given for the transfer must actually and in real terms enhance the worth of debtor's estate

---

**4.** Congress intended "new value" to have its ordinary meaning, but defined the term "to avoid any confusion or uncertainty." *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 372, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6328; S. Rep. No. 989, 95th Cong., 2nd Sess. 87 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5783. It has not helped. *See* 1 David G. Epstein Et Al., Bankruptcy § 6–25, at 592 (1st ed.1992).

so as to offset the reduction in the estate the transfer caused. *See id.*

■ Courts have held that because § 547(c)(1) expressly protects transfers only "to the extent" the exchange was for new value, " '[a] court must measure the value given to the creditor and the new value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange.' " *Lowrey v. U.P.G., Inc. (In re Robinson Bros. Drilling, Inc.),* 877 F.2d 32, 34 (10th Cir.1989), *quoting Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida Sys., Inc.),* 861 F.2d 1555, 1558–59 (11th Cir.1988). Moreover, § 547(a)(2)'s definition of the term "new value" implies a specific valuation in "money or money's worth" that debtor received in the exchange. *Creditor's Comm. v. Spada (In re Spada),* 903 F.2d 971, 976 (3d Cir.1990); *In re Robinson Bros. Drilling, Inc.,* 877 F.2d at 34; *Jet Florida Sys., Inc.,* 861 F.2d at 1559.

■ The new value exception may be satisfied by an indirect transfer of value via a third-party to debtor rather than a direct transfer of value from creditor to debtor. Moreover, under some circumstances, the release of a lien or a security interest can be new value, even though it comes from a third party. *See, e.g., Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.),* 59 F.3d 969, 973 (9th Cir.1995); *In re Robinson Bros. Drilling, Inc.,* 877 F.2d at 33–34; *In re Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d at 231; *Cocolat, Inc. v. Fisher Dev., Inc. (In re Cocolat, Inc.),* 176 B.R. 540, 547 (Bankr.N.D.Cal. 1995).

Courts have long held that the key factor in determining whether a payment is a preference under § 547(b) is the " 'percentage ... [creditors'] claims are entitled to draw out of the estate of the bankrupt.' " *In re Powerine Oil,* 59 F.3d at 972, *quoting Swarts v. Fourth Nat'l Bank,* 117 F. 1, 7 (8th Cir.1902). Thus, the relevant inquiry under § 547(b) focuses "not on whether a creditor may have recovered all of the monies owed by the debtor from any source whatsoever, but instead upon whether the creditor would have received less than a 100% payout" from debtor's estate. *Id., quoting Smith v. Creative Managment, Inc. (In re Virginia–Carolina Fin. Corp.),* 954 F.2d 193, 199 (4th Cir.1992).

■ Likewise, the key factor in determining whether a preferential payment is excepted from avoidance as new value under § 547(c)(1) is the effect on the estate of debtor. *See In re Powerine Oil Co.,* 59 F.3d at 973; *In re Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d at 229–30.

■ Where the creditor's indirect lien is fully secured by assets of debtor, the preferential transfer can be protected by the new value exception. For example, in *In re Fuel Oil Supply & Terminaling, Inc.,* the Fifth Circuit held that the trustee could not recover the preferential payment made by debtor to a creditor who held a standby letter of credit issued by a bank on account of debtor because the bank's reimbursement claim against debtor was fully secured by assets of debtor. *See In re Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d at 229–30. The court reasoned that when debtor paid the creditor, the bank's exposure under the letters of credit was reduced by a corresponding amount. *See id.* at 230–31. The bank's contingent reimbursement claim against debtor's assets was thereby released, giving debtor new value. *See id.* at 231. "This outcome is consistent with the principle underlying § 547(c)(1) because the release of the debtor's collateral offsets the transfer to the creditor, thereby resulting in no depletion to the debtor's estate." *Id.* at 228.

However, where the creditor's indirect lien is only partially secured by assets of debtor, the preferential transfer can be protected by § 547(c)(1) only to the extent that it is secured by estate assets. For example, in *In re Powerine Oil Company*, it was held that the trustee could recover the preferential payment made by debtor to a creditor who held a standby letter of credit issued by a bank on account of debtor to the extent that the bank's reimbursement claim against debtor was unsecured by assets of debtor. *See In re Powerine Oil Company*, 59 F.3d at 974. The court reasoned that when debtor paid the creditor, the bank's exposure under the letters of credit was reduced by a corresponding amount, and the bank's contingent reimbursement claim against debtor's assets was thereby released but only to the extent the claim was secured. *See id.* at 973. While debtor received new value equal to the amount the bank's reimbursement claim was secured by debtor's assets, it did not receive new value to the extent that the bank's reimbursement claim was unsecured because the bank could not release a security interest in debtor's assets that it did not in fact have. *See id.* at 973–74. This outcome is also consistent with the principle underlying § 547(c)(1).

In light of these principles, the court now turns to the specific issues for each defendant.

## A. C.A. GUARD.

### 1. Procedural Matters.

As a preliminary matter, there is some question as to whether C.A. Guard is entitled to assert an affirmative defense under § 547(c)(1). The opposing parties' positions have polarized over time. *Compare C.A. Guard's Answer*, at 3 (asserting transfer "was made in the ordinary course of business dealing" but not citing any Bankruptcy Code sections), *C.A. Guard's Mot. Summ. J.*, at 4, 5 (citing only § 547(c)(1)'s new value exception), *and C.A. Guard's Post-trial Proposed Findings of Fact and Conclusions of Law*, at 7, citing § 547(c)(1) and (c)(2), *with Trustee's Mot. Summ. J.*, at 7 n. 3 (asserting in footnote that because C.A Guard has not pled § 547(c)(1) as an affirmative defense, C.A Guard is barred from pursing this defense in its motion for summary judgment), *and Trustee's Post-trial Proposed Findings of Fact and Conclusions of Law*, at 7, 11 (arguing, in the alternative, that C.A. Guard's failure to raise § 547(c)(1) in answer waives this affirmative defense).

Federal Rule of Civil Procedure 15(b), as made applicable by Bankruptcy Rule 7015, states:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but such failure so to amend does not affect the result of the trial of these issues....

Because the issues relating to § 547(c)(1) were tried under circumstances that did not unduly prejudice the trustee, the court will address the merits of this defense. *See Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 482–83 (4th Cir.1992).

### 2. Substantive Matters.

C.A. Guard asserts it has an affirmative new value defense under § 547(c)(1) because it was a subcontractor that released its rights in perfected mechanics' liens.

In theory, if the subcontractor in such case had actually enforced its mechanic's

lien rights against the owner of the property, the owner probably would have had a claim against the [debtor] contractor based on indemnity or subrogation. Therefore, if enforcement of the subcontractor's mechanic's liens has not yet occurred, the owner holds a contingent claim in the [debtor] contractor's bankruptcy.... [W]hen the subcontractor releases its rights against the owner's property, there is a corresponding release of the owner's third-party contingent claim against the estate, thus reducing the contingent liability of the debtor's estate.

L. Wearen Hughes & Beth A. Dunning, *Holding on to What You Have Been Paid: Defending a Preference Action Against a Contractor, Subcontractor or Supplier,* CONSTRUCTION LAW., Jan. 1996, at 15, 19.

The parties disagree on when new value should be measured. C.A. Guard asserts that the appropriate time is when the mechanics' liens were filed and that it was fully secured. The trustee asserts that the appropriate time is the date of the preferential transfer; thus C.A. Guard was undersecured.

 The court holds that the time for judging the extent of new value exchanged under § 547(c)(1) is when the transfer or exchange occurred. *See Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 733 (9th Cir.1994); *In re Robinson,* 877 F.2d at 33; *Jet Florida Sys., Inc.,* 861 F.2d at 1559 n. 5; *In re Cocolat, Inc.,* 176 B.R. at 547.

 The court must next determine the extent of new value exchanged. "The critical inquiry in this proceeding is not whether [the defendant] possessed lien or bond claims, but whether [the defendant] possessed lien or bond claims against property of the estate, making [the defendant] a secured claim holder." *Rieser v. Landis & Gyr Powers, Inc. (In re Bownic Insulation Contractors, Inc.),* 134 B.R. 261, 266 (Bankr.S.D.Ohio 1991); *accord In re Powerine Oil Co.,* 59 F.3d at 973; *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 596 (11th Cir.1990); *In re Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d at 229–30.

 A mechanic's lien is a statutory lien on real estate. 53 AM. JUR. 2D *Mechanics' Liens* § 5 (1996). The lien is purely a matter *in rem. See id.* It is not an interest in land but operates in the nature of an attachment or garnishment. *See id.*

Under Virginia law, a subcontractor who does not contract with the owner is given an option of having a derivative or an independent lien, but the amount of the subcontractor's recovery is limited to the amount of outstanding indebtedness between the owner and general contractor. *See* VA. CODE ANN. § 43–7(A) (Repl.Vol. 1999); *see also Thompson v. Air Power, Inc.,* 248 Va. 364, 448 S.E.2d 598 (1994). The owner is not required to pay in excess of the agreed price stipulated in the contract with the general contractor; the owner is required to pay for the building but once. *See* 53 AM. JUR. 2D *Mechanics' Liens* § 248, *citing Nicholas v. Miller,* 182 Va. 831, 30 S.E.2d 696 (1944). The subcontractor's lien is limited to the amount due to the contractor at the time of service of notice to the owner, or to such amount as may afterward become due. *See* VA. CODE ANN. § 43–7(A). Moreover, the owner can reduce the subcontractor's claims by any recoupment,[5] setoffs or counterclaims that

---

5. Recoupment is the right of a defendant to reduce plaintiff's monetary claim by reason of

a claim defendant has against the plaintiff arising out of the very contract giving rise to

the owner has against the general contractor, *see Middleton & Dugger Plumbing & Heating, Inc. v. Richardson Builders, Inc. (In re Richardson Builders, Inc.),* 123 B.R. 736, 738 (Bankr.W.D.Va.1990), *citing* Va. Code Ann. § 43–7, –9. If the owner is compelled to complete the building "the amount expended by the owner for such completion shall have priority over all mechanics' liens which have been or may be placed on such building." Va. Code Ann. § 43–16.

The court finds that C.A. Guard has failed to prove whether its mechanics' liens had any value on the date of the transfer. No evidence has established the amount, if any, A.H. Robins owed Suitt Construction on that date or whether on that date GEM could have received any money from Investment Partners net of claims for recoupment. Therefore, the court holds that none of the preferential transfer to C.A. Guard is excepted from avoidance as new value under § 547(c)(1).

### B. *STOVALL.*

Stovall asserts it has an affirmative defense under § 547(c)(1) because it gave new value to GEM when it executed the final lien waivers. Specifically, Stovall contends that it gave new value under three separate theories.

First, the lien waiver released Stovall's claim against the bond thereby releasing funds held by the owner from an equitable lien by the bonding company. Second, because the contract balance held by the owner exceeded the amount of Stovall's mechanic's lien, the owner's right to indemnification from the debtor was fully secured. Consequently, when Stovall released its lien, the owner's claim for indemnification was also released. Finally, when Stovall released its mechanic's lien claim against the property, it "primed" the debtor's inchoate lien rights against the property.

*Reply to Trustee's Proposed Findings of Fact and Conclusions of Law (Stovall Assoc., Inc.),* ¶ 62.

The court will address each of Stovall's arguments in seriatim.

#### 1. Release of Bonding Company's Contingent Equitable Lien.

Stovall's first argument that it gave new value is based on the release of the bonding company's contingent equitable lien in the contract balance held by owner (consisting of retainage and other sums due under the contract).[6]

GEM's surety bond provided that funds earned by GEM could be used by the surety to satisfy GEM's obligations under the contract, subject to the owner's priority to use funds due GEM to complete the project. In November 1997, after completing its subcontract work, Stovall made demand for payment on the bonding company and the owner. A partial payment was made by the owner in January 1998, via a joint check made payable to GEM and Stovall. On February 5, 1998, Stovall filed suit against GEM and the surety for the balance of its subcontract, and on February 18, 1998, GEM delivered its check to Stovall for the $81,874.00 balance due.

---

the plaintiff's claim. *See F.D.I.C. v. Marine Midland Realty Credit Corp.,* 17 F.3d 715, 722 (4th Cir.1994).

**6.** Reported cases interpreting property of the estate under § 541 hold that retained funds do become property of debtor's estate, subject to the equitable interests of the surety, materi-almen and laborers. *See Red Sea Group, Ltd. v. Home Builders, Inc. (In re Home Builders, Inc.),* 213 B.R. 475, 477 (Bankr.E.D.Va.1997). The trustee, however, won't have anything to administer if the funds do not exceed the equitably superior claims of the surety, materialmen and laborers. *See id.*

Stovall contemporaneously executed a final lien waiver and also dismissed its lawsuit. On the date of this payment, the owner owed GEM approximately $120,000.00 under the general contract, and GEM owed its subcontractors approximately $254,832.08. Stovall's situation was unique because up through the transfer date, none of GEM's other subcontractors on the project had made demand for payment on either the surety or the owner.

In *Pearlman v. Reliance Ins. Co.*, the Supreme Court held that a construction contract surety who completes a job for a defaulting contractor obtains a common-law equitable right of subrogation to contract proceeds, which is superior to the interests of the bankruptcy estate. *See* 371 U.S. 132, 140–41, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).[7] Some courts have extended this to hold that new value is given where there are sufficient identifiable contract proceeds to satisfy the surety's equitable lien. *See, e.g. O'Rourke v. Coral Constr., Inc. (In re Fegert)*, 88 B.R. 258, 260 (9th Cir. BAP 1988) (holding that "[s]ince the Debtor's payments to the subcontractors avoided the imposition of an equitable lien by the surety on future payments under the contract, there was no diminution of the estate. Under these facts, the release of the subcontractors' rights against the surety, which in turn could have exercised its lien rights, constituted 'new value' being given in a substan-

tially contemporaneous exchange."), *aff'd*, 887 F.2d 955 (9th Cir.1989).

However, where the bonded contract is operating at a loss, a deficiency results between the equitable lien the surety would have received had it made the payments itself and the contract proceeds available to satisfy it. *See Newbery Corp.*, 106 B.R. at 187–88. To the extent the subcontractor's preferential payments exceed the amount of contract proceeds that could have been released from an equitable lien, they would amount to the release of an unsecured indemnity claim against the estate which would not constitute new value within the meaning of § 547(a)(2). *See id.*

Stovall asserts that if debtor-contractor GEM did not pay the subcontractor Stovall, then the subcontractor would have been paid by the surety Markel, and the surety would have been secured by an equitable lien on funds that the owner BTS owed to debtor-contractor. Stovall also points out that the surety wrote the owner and requested the owner to make full payment to the subcontractor that had made a claim against the bond (*i.e.*, Stovall).

Stovall argues that because it was the only creditor that had a matured claim against the bond at the time of the preferential transfer, the lien waiver provided new value by releasing funds held by the owner from the bonding company's equita-

---

7. The right of subrogation is an equitable doctrine that allows " 'a surety who pays the debt of another ... to [assert] all the rights of the person he paid to enforce his right to be reimbursed.' " *Western Cas. & Sur. Co. v. Brooks (In re Bruns Coal Co.)*, 362 F.2d 486, 490 (4th Cir.1966), *quoting Pearlman*, 371 U.S. at 137, 83 S.Ct. 232. "The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties."

*Memphis & L.R.R. v. Dow*, 120 U.S. 287, 301–02, 7 S.Ct. 482, 30 L.Ed. 595 (1887). However, it assumes the form of an equitable lien which can attach to proceeds from the bonded contract. *See Newbery Corp. v. Fireman's Fund Ins. Co.*, 106 B.R. 186, 187 (D.Ariz. 1989). Thus, "[t]he doctrine of subrogation arises out of the unpaid debts on each contract; relates back in time to the execution of that specific bond; and is limited in scope to the debts arising under one contract." *In re Bruns Coal Co.*, 362 F.2d at 491.

ble lien. Markel's surety obligation on the bond was subject to a condition precedent that it and the owner be given notice in accordance with the bond terms. As stated previously, on February 18, 1998, the date of the transfer, Stovall was the only subcontractor that had given notice in accordance with the bond terms. While GEM owed other subcontractors $172,906.23, the surety did not have any liability for those debts because the other subcontractors had not made a claim on the bond. Thus, at the time of the transfer, the surety was fully secured on its $81,874.00 liability to Stovall (which was created not later than November 18, 1997, the date on which Markel received notice of Stovall's claim), and the estate was not depleted.

Although claims ultimately made against the bond exceeded the amount held by the owner to satisfy those claims, under Stovall's approach, the relevant inquiry is the unpaid amount of the surety's contingent claims that have matured into actual liabilities at the time of the transfer. Stovall asserts that nothing in the Code permits, much less requires, the court to look at whether the new value is subsequently encumbered when assessing the transaction at issue. Furthermore, if that new value subsequently becomes subject to a new equitable lien after the first is released, that new equitable lien must be assessed in isolation to determine whether it constituted an avoidable preference that depletes the estate to the detriment of other creditors.

The trustee, on the other hand, argues that the preferential transfer did not enhance the worth of Gem's estate so as to offset the reduction in the estate. When GEM paid $81,874.00 to Stovall, no new value was released to debtor. Before the transfer Markel had a contingent liability of $254,780.23 that was secured by the $120,000.00 equitable lien on what the owner owed to GEM. After the transfer Markel had a contingent liability of $172,906.23 that was secured by the $120,000.00 equitable lien on what the owner owed to GEM. The $81,874.00 payment succeeded in lowering Markel's contingent liability from $254,780.23 to $172,906.23 but from GEM's perspective did not reduce the $120,000.00 equitable lien on the contract balance held by the owner. The trustee further argues that if Stovall's position were adopted, the retainage amount could provide new value for multiple transfers involving unsecured creditors without debtor ever receiving any new value.

Stovall counters that there is a logical flaw inherent in the trustee's approach: the trustee's argument is based on the false assumption that the surety's liability is co-extensive with that of the principal. This assumption is contrary to the plain language of the bond, which imposes liability on the surety only after certain conditions have been met. Thus, Stovall argues there is a clear distinction between the surety's liability and the principal's liability.

Under the facts and circumstances of this case, the court finds Stovall's arguments more persuasive and specifically agrees with Stovall on this last point. At the time of the transfer, debtor owed the other subcontractors $172,958.08, but Markel did not have any liability for those debts because the other subcontractors had not made a claim on the bond.[8] Thus,

---

**8.** The relevant provision of the bond states:

4 The Surety shall have no obligation to Claimants under the Bond until:

4.1 Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and

at the time of the transfer, Markel could have paid Stovall and would have been fully secured on the $81,874.00 payment to Stovall. Restated, the subcontractor had a matured claim against the surety bond, the surety had an equitable lien on the contract amounts held by the owner, and the owner could fully recoup the amount from retainage due debtor-contractor. Since GEM's payment to Stovall avoided the imposition of an equitable lien by Markel on the contract amounts held by BTS, there was no diminution of the estate. Under these facts, the release of the subcontractors' rights against the surety, which in turn could have exercised its lien rights, constituted new value being given in a substantially contemporaneous exchange.

Accordingly, the court finds that the preferential transfer to Stovall is protected from avoidance under the new value exception based on the release of the bonding company's contingent equitable lien in the contract balance held by owner.

### 2. Release of Owner's Contingent Indemnification Rights.

Stovall's second argument that it gave new value is based on the owner's release of contingent indemnification rights in the contract balance held by the owner. During the time that Stovall could have per-

> sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.
> 4.2 Claimants who do not have a direct contract with the Contractor:
> .1 Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

fected its mechanic's lien rights, GEM paid Stovall, and Stovall signed a lien waiver.

Stovall argues that under this theory, the owner's (BTS's) right to indemnification from debtor-contractor (GEM) was fully secured because it was in the nature of recoupment and the contract balance held by the owner exceeded the amount of the subcontractor's (Stovall's) unperfected mechanic's lien rights. Consequently, when Stovall released its unperfected mechanic's lien rights, the owner's fully secured contingent claim for indemnification was also released.

The court need not rule on this second theory, having already found that the payment to Stovall is protected from avoidance under § 547(c)(1)'s new value exception under Stovall's first theory.

### 3. Priority of General Contractor's Inchoate Mechanic's Lien Rights.

■■■ Stovall's third and final argument that it gave new value is based upon its release of unperfected lien rights. Stovall argues that by releasing its unperfected mechanic's lien rights against the property, it "primed" debtor's unperfected mechanic's lien rights against the property. Stovall explains:

> .2 Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and
> .3 Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

When Stovall performed its work, both Stovall and the debtor obtained mechanic's liens against the [owner's] property, but Stovall's lien had priority over the debtor's.[9] When Stovall released its lien by accepting payment, it enhanced the value of the debtor's lien because it was no longer subject to Stovall's superior lien. In essence, Stovall's lien waiver acted as a conveyance of Stovall's property/lien rights in the owner's property to the debtor.

*Stovall's Mem. in Supp. of Mot. for Summ. J.*, at 8.

The courts are divided on whether the release of the right to file an otherwise unperfected statutory lien is new value. *Compare, e.g., Cimmaron Oil Co., Inc. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1009 (N.D.Tex.1987) (holding foregoing right to perfect lien is not new value), *Ragsdale v. M & M Elec. Supply, Inc. (In re Control Elec., Inc.)*, 66 B.R. 624, 626–27 (Bankr.N.D.Ga.1986) (holding forbearance to assert inchoate lien is not new value), *and Tidwell v. Bethlehem Steel Corp. (In re Georgia Steel, Inc.)*, 56 B.R. 509, 522 (Bankr.M.D.Ga.1985) (holding waiver of inchoate mechanic's lien is not new value),[10]

*with Simon v. Engineered Protection Sys., Inc. (In re Hatfield Elec. Co.)*, 91 B.R. 782, 786 (Bankr.N.D.Ohio 1988) (explaining that "[t]he right of a third party to withhold or retain payment constructively released by debtor's payment in exchange for waiver of creditor's inchoate lien would come within the term 'money' in the definition of 'new value.'"), *Mason and Dixon Lines, Inc. v. St. Johnsbury Trucking Co. (In re Mason and Dixon Lines, Inc.)*, 65 B.R. 973, 979 (Bankr.M.D.N.C.1986) (holding creditor's relinquishment of right to setoff at the time of acceptance of payment constitutes new value because it is analogous to a holding that the relinquishment of inchoate lien rights constitutes new value), *and LaRose v. Crosby & Son Towing, Inc. (In re Dick Henley, Inc.)*, 38 B.R. 210, 214 (Bankr.M.D.La.1984) (holding the release of the owner's claim against the general contractor constitutes new value to debtor from the subcontractor either because such a release is additional to the illustrative list of new value items in § 547(a)(2) or alternatively because the release of lien is a release of property to debtor through the device of the coincident release of the owner's claims against debtor).

---

**9.** Virginia Code § 43–23 provides:

> Priority among liens perfected under this chapter.—There shall be no priority among the liens created and perfected under this chapter, except that the lien of a subcontractor shall be preferred to that of his general contractor; ....

**10.** The court in *In re Georgia Steel, Inc.* went on to discuss the ramifications of its decision:

> The Court recognizes the impact and the hardship that this decision may have on the construction industry in Georgia. *See Ballard v. Grubbs (In re Grubbs)*, 9 B.R. 499, 501 (M.D.Ga.1981). From a practical standpoint, even when a materialman receives full payment from a contractor, the materialman could be forced to file a claim of a materialman's lien within the ninety-

day statutory time limit or lose the protection of the lien laws in the event of a subsequent bankruptcy filing by the contractor. Despite this consequence, the function of this Court is to interpret the laws enacted by Congress. Congress has determined the order and priorities in the distribution of a bankrupt's estate through its enactment of the Bankruptcy Code. In this adversary proceeding, if is doubtful that Congress contemplated Defendant's situation and the resulting consequences, but it is up to Congress, not this Court to correct this result. The impact of this decision also could be changed by the state legislature, which could adopt a specific trust fund statute and thereby remove payments, such as the ones Defendant received, from preferential attack under section 547(b).

56 B.R. at 522.

A mechanic's lien created by Virginia Code § 43–3 is one in derogation of the common law. *See American Std. Homes Corp. v. Reinecke,* 245 Va. 113, 425 S.E.2d 515, 518 (1993). Once perfected in accordance with § 43–4, the lien can be enforced by suit. *See id.* In Virginia, the provisions of the enforcement statutes are to be construed liberally, while the requirements of the perfection statutes are to be construed strictly. *See id.* Unless a mechanic's lien is perfected within the proper time and in the proper manner, as outlined by the statute, it is lost. *See id.* Neither Stovall or GEM had perfected mechanic's liens at the time of the preferential transfer. However, the court need not decide whether release of an unperfected mechanic's lien constitutes new value. Even if the court accepted Stovall's argument that GEM's lien was enhanced because it is no longer subject to Stovall's superior lien, GEM's lien as a general contractor would still be subject to the superior liens of other subcontractors. *Cf.* Va. Code Ann. § 43–23 (Michie 1999) (discussing priority of perfected mechanic's liens). On the date of the transfer, the owner BTS owed GEM $120,000.00; whereas, GEM owed all its subcontractors, including Stovall, $254,832.08.

The court finds that Stovall has failed to prove that its "priming" GEM's unperfected mechanic's lien provided any tangible value to GEM and thus has failed to prove any new value under its third theory.

## II. *Section 547(c)(2) Ordinary Course of Business Exception.*

The final issue is whether GEM's payment to defendant C.A. Guard is protected from avoidance under the ordinary course of business exception. Section 547(c)(2) provides as follows:

(c) The trustee may not avoid under this section a transfer—

. . . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made the in ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

The Bankruptcy Code does not define these phrases. The legislative history states simply that the "purpose of [the ordinary course of business] exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the general preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S. Rep. No. 989, 95th Cong., 2nd Sess. 88 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874. The Fourth Circuit has stated that "[t]he purpose of the ordinary course exception is to 'leave undisturbed normal financial relations' which do not entail any 'unusual action' taken by either the debtor or the creditor." *Morrison v. Champion Credit Corp. (In re Barefoot),* 952 F.2d 795, 801 (4th Cir.1991).

The burden is on the defendant to prove each of the three elements of the exception. *See* 11 U.S.C. §§ 547(c)(2), (g).

### A. Section § 547(c)(2)(A).

The first element that must be shown before the transferee may use this defense is that the debt was incurred in the ordinary course of business or financial affairs of debtor and the transferee. *See* 11 U.S.C. § 547(c)(2)(A). This means that

the incurring of the debt would be a "logical and ordinary action for these parties." *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 488 (4th Cir.1992).

This court has previously held that the C.A. Guard has satisfied this element. *See* Mem. Op. at 10 (entered Jan. 5, 2000).

B. Section § 547(c)(2)(B).

■■■ The second element is that debtor made the transfer in the ordinary course of business of debtor and the transferee. *See* 11 U.S.C. § 547(c)(2)(B). This is the so-called subjective test: whether the parties themselves considered the transaction ordinary. *See Cocolat, Inc. v. Fisher Dev., Inc. (In re Cocolat)*, 176 B.R. 540, 549 (Bankr.N.D.Cal.1995). In order for this element to be satisfied, subsection B requires proof that the payments on the debt "are ordinary in relation to past practices between debtor and this particular creditor." *Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.)*, 971 F.2d 396, 398 (9th Cir.1992); *accord Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989), *quoting WJM, Inc. v. Massachusetts Dep't of Pub. Welfare*, 840 F.2d 996, 1011 (1st Cir.1988) (stating that "the cornerstone of this element of a preference defense is that the creditor needs to demonstrate some consistency with other business transactions between debtor and the creditor.").

■■■ Among the factors courts consider in determining whether transfers are ordinary in relation to past practices are: (1) the length of time the parties were engaged in the transactions at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Sulmeyer v. Pacific Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir. 1994).

■■■ The facts and circumstances of this case persuade the court that the payment was not ordinary in relation to past practices between C.A. Guard and GEM. While the two parties had done business together off and on for twenty years, this was the first time that C.A. Guard had ever filed a mechanic's lien on any job that it had with GEM. The court recognizes that C.A. Guard had a limited time frame in which to file mechanics' liens for purposes of preserving and protecting its rights as a subcontractor, but this unusual action also coerced a payment from GEM. At the time the transfer was made on January 23, 1998, the invoices dated July 22, 1997, and October 24, 1997, had been outstanding for 91 days and 185 days, respectively. The court finds the preferential transfer was not based on how long the invoices had been outstanding, nor was it based on when GEM received payment from the project owner. Rather, the transfer was made to lift the mechanics' liens. Because the transfer was not ordinary in relation to past practices, the court holds that C.A. Guard has failed to prove the element of § 547(c)(2)(B).

C. Section § 547(c)(2)(C).

■■■ The third element C.A. Guard must satisfy is that the transfer was made "according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C). This is the so-called objective test: whether the relevant industry would consider the payment to have been made according to ordinary business terms. *See In re Cocolat*, 176 B.R. at 549.

The Fourth Circuit has taken the position that subsection C requires proof that debtor made its pre-petition preferential transfer in harmony with the range of credit terms prevailing as some relevant industry's norm. *See Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1047–48 (4th Cir.1994) (adopting the reasoning from *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029 (7th Cir.1993), as modified and embellished by *Fiber Lite Corp. v. Molded Acoustical Prods, Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217 (3d Cir.1994)). The extent to which a preference payment's credit terms can stray from the industry norm yet still satisfy subsection C depends on the duration of debtor-creditor relationship. *See id.* at 1049. "[T]he more cemented (as measured by its duration) the pre-insolvency relationship between debtor and creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)." *Id.*

> In sum, we read subsection C as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection. In addition, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C.

*Id., quoting Molded Acoustical Prods., Inc.*, 18 F.3d at 226.

However, subsection C never tolerates a gross departure from the industry norm, not even when the parties have had an established and steady relationship. *See id.* at 1050.

To apply this sliding-scale approach to ascertain the appropriate benchmark from which one determines whether a preference payment's credit terms are unusual, the court must: (1) look at the range of terms on which firms comparable to the creditor provide credit to firms comparable to debtor; (2) look to the length of the parties' relationship predating debtor's insolvency to estimate the size of the customized window surrounding the industry norm which was established in the first step; and (3) determine whether the relationship remained relatively stable leading into and throughout the insolvency period. *See Molded Acoustical Prods., Inc.*, 18 F.3d at 227.

The court finds that C.A. Guard has not sufficiently proven what range of terms comprised the construction industry norm. Without a baseline, it is impossible to ascertain whether the payment constituted a gross departure from the industry norm. Moreover, C.A. Guard has not proven what range of terms occurred throughout the twenty year debtor-creditor relationship. Without this history, the court cannot determine how much the parties' terms can stray from the norm, nor can the court determine whether the terms remained relatively stable leading into and throughout the insolvency period. Because the court cannot ascertain the appropriate benchmark from which to determine whether a preference payment's credit terms are unusual, C.A. Guard has failed to prove this element.

Because C.A. Guard has failed to prove the second and third elements under § 547(c)(2)'s conjunctive test, none of the preferential transfer to C.A. Guard is protected from avoidance under the ordinary course of business exception.

An order consistent with this opinion will be entered.