**In re JWJ CONTRACTING COMPANY, INC., Debtor.**

**Joseph J. Janas, Chapter 7 Trustee, Appellant,**

**v.**

**Marco Crane & Rigging Co.; United States Trustee, Appellees.**

**Joseph J. Janas, Chapter 7 Trustee, Appellant,**

**v.**

**Endo Steel, Inc.; United States Trustee Appellees.**

**BAP Nos. AZ–02–1079–RyPBl, AZ–02–1133–RyPBl. Bankruptcy No. 94–06045–PHX–RTB. Adversary No. 96–00497.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Sept. 20, 2002.

Filed Dec. 10, 2002.

Thomas C. Axelsen, Mohr, Hackett, Pederson, Blakely & Randolph, P.C., Phoenix, AZ, for Joseph J. Janas, Ch. 7 Trustee.

Michael S. Rubin, Mariscal, Weeks, McIntyre & Friedlander, Phoenix, AZ, for Marco Crane & Rigging; Endo Steele, Inc.

Before RYAN, PERRIS, and BLUEBOND [1], Bankruptcy Judges.

## *OPINION*

RYAN, Bankruptcy Judge.

After JWJ Contracting Company, Inc. ("Debtor") filed a chapter 11 [2] bankruptcy petition, the case was converted to chapter 7, and Joseph J. Janas was appointed trustee ("Trustee"). Trustee filed a preference action (the "Preference Action") against numerous defendants, including Marco Crane & Rigging Company ("Marco") and Endo Steel, Inc. ("Endo") (collectively, the "Subcontractors").

The Subcontractors then moved for summary judgment asserting that they provided new value under § 547(c)(1). Trustee responded with cross motions for summary judgment arguing that all the elements of a preference had been established and § 547(c)(1) did not apply. After a hearing, the bankruptcy court granted summary judgment for the Subcontractors. Thereafter, Trustee filed a motion for reconsideration of the order granting

summary judgment to Endo (the "Reconsideration Motion"), which was denied.

Subsequently, Trustee timely appealed the summary judgment and reconsideration orders.

We REVERSE and REMAND.

## I. FACTS

Debtor entered into a contract (the "Contract") with the city of Phoenix (the "City") to perform work on one of the runways at the City's Sky Harbor International Airport (the "Project"). Debtor, as the general contractor, posted a payment bond issued by Continental Insurance Company ("Continental") guaranteeing completion of the Project and payment in full to material suppliers and subcontractors (the "Bond").

Debtor later entered into a subcontract with Endo, whereby Endo agreed to supply and install all the steel reinforcing bars required by the Project. Later that year, Debtor entered into a subcontract with Marco, whereby Marco agreed to lease and operate equipment for the Project.

At some point, Debtor began experiencing financial difficulties, and it fell behind on its payments. As a result, the Subcontractors threatened to demand payment from Continental under the Bond. On April 12, 1994, Debtor issued a check to Marco for $37,030.52 (the "Marco Payment"). In return, Marco executed an unconditional lien release that waived its rights to payment under the Bond.

On April 14, 1994, Debtor issued a check to Endo for $194,286.71, and Endo executed an unconditional lien release that waived its rights to payment under the

---

**1.** Hon. Sheri Bluebond, Bankruptcy Judge for the Central District of California, sitting by designation.

**2.** Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

Bond. Debtor's bank returned the check unpaid for insufficient funds (the "NSF Check"). Endo immediately stopped work on the Project and informed Debtor that it would not resume work until Debtor provided it with a cashier's check (the "Cashier's Check"). On May 2, 1994, Debtor replaced the NSF Check with the Cashier's Check (the "Endo Payment").

As of May 2, 1994, Debtor had received $7,763,028 from the City under the Contract, and afterwards, the City paid Debtor over $767,000.[3]

On July 1, 1994, Debtor filed its chapter 11 bankruptcy petition. Debtor continued to operate for an additional two months before terminating its business. Later, Debtor's chapter 11 case was converted to chapter 7, and Trustee was appointed.

Under the Bond, Continental paid more than $2 million to complete the Project.

On February 3, 1997, Trustee filed the Preference Action alleging that the Endo and Marco Payments were avoidable under § 547.

Thereafter, Endo filed its motion for summary judgment (the "Endo Motion"), contending that it gave a contemporaneous exchange of new value for the Endo Payment when it released its lien.

Trustee responded that a replacement check cannot constitute a contemporaneous exchange for new value and Continental's equitable lien was undersecured when the Endo Payment was made.

Trustee also filed a cross motion for summary judgment (the "Endo Cross Motion"). Trustee asserted that Endo had received a preference and the § 547(c)(1) exception did not apply for the same reasons that the Endo Motion should be denied.

In response, Endo reasserted its § 547(c)(1) defense.

At the hearing on November 5, 2001, the bankruptcy court stated:

> The May 2nd payment to Endo meets the core elements for an avoidable preference under Section 547 [Endo is a creditor, debt is an antecedent debt, debtor was insolvent, made within the 90 day period and allowed Endo to receive a greater payment than if paid in a chapter 7 case]. The parties correctly focus on two issues. Whether the payment to Endo (1) is not a preference under the equitable subrogation rights that protect Continental and Endo, and (2) becomes preferential because the first check to Endo was not honored by the debtor's bank when presented for payment.

Minute Entry/Order for Matter Taken Under Advisement (Nov. 5, 2001), at 2 (bracketed material in the original).

The bankruptcy court concluded that *O'Rourke v. Seaboard Surety Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955 (9th Cir. 1989) (*"Fegert II"*) controlled, causing the Endo Payment to be a contemporaneous exchange for new value. Judgment was entered for Endo (the "Endo Judgment").[4]

---

**3.** In addition, the City paid over $200,000 to Continental after it assumed responsibility for the Project under the Bond.

**4.** The Endo Judgment contained a Federal Rule of Civil Procedure ("FRCP") 54(b) certification. Rule 7054 makes FRCP 54 applicable by reference. FRCP 54 provides in pertinent part that

[w]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the

Trustee then filed the Reconsideration Motion.[5] Trustee reasserted that no new value was given in exchange for the Endo Payment because the payment did not actually reduce Continental's equitable lien. Trustee pointed out that Continental's lien was undersecured by more than $2.5 million on the date of transfer and the Endo Payment came from unencumbered funds in Debtor's operating account. Therefore, the transfer only reduced the unsecured portion of Continental's undersecured lien.

Endo opposed the Reconsideration Motion, arguing that it gave new value because it released its right to be paid by Continental. According to Endo, "[a]s a consequence of that release, unpaid job proceeds equaling the amount paid to Endo Steel, were available to be paid to JWJ." Endo Steel's Response to Trustee's Motion for New Trial (Jan. 14, 2002), at 4.

After a hearing, the bankruptcy court denied the Reconsideration Motion (the "Reconsideration Order").

Turning now to the Marco Payment, Marco filed a motion for summary judgment (the "Marco Motion"), asserting essentially the same § 547(c)(1) defense as Endo.[6] Trustee opposed the Marco Motion, raising the same arguments asserted in response to the Endo Motion. Trustee also filed a cross motion for summary judgment (the "Marco Cross Motion"), again mirroring its assertions in the Endo

Cross Motion. Judgment was entered for Marco (the "Marco Judgment").

Trustee then timely appealed the Endo and Marco Judgments (the "Judgments") and the Reconsideration Order.

## II. ISSUES

A. Whether the bankruptcy court erred in granting the Endo Motion and denying the Endo Cross Motion.

B. Whether the bankruptcy court erred in granting the Marco Motion and denying the Marco Cross Motion.

C. Whether the bankruptcy court erred in denying the Reconsideration Motion.

## III. STANDARD OF REVIEW

██ We review a grant or denial of summary judgment de novo. *See Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 828 (9th Cir.2001).

██ We review the denial of a motion for reconsideration or new trial for an abuse of discretion. *See Dicker v. Dye (In re Edelman)*, 237 B.R. 146, 150 (9th Cir. BAP 1999).

---

absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

FED R. CIV. P. 54(b).

5. Trustee timely filed two reconsideration motions, the first was a motion for reconsideration and the second was a motion for a new trial under FRCP 59(a). Both motions assert the same arguments, and Endo filed a single response to both motions. Additionally, the bankruptcy court held a single hearing on both motions. Therefore, for ease of reference, we refer to both motions as the Reconsideration Motion.

6. We note that both Endo and Marco were represented by the same attorneys, Michael S. Rubin and Paul Ruderman.

## IV. DISCUSSION [7]

A. *The Bankruptcy Court Erred in Granting the Endo Motion and Denying the Endo Cross Motion.*

In granting the Endo Motion and denying the Endo Cross Motion, the bankruptcy court determined that contemporaneous new value was given by Endo. Although holding that all the elements for a preference had been established, the bankruptcy court held that replacing the Cashiers' Check for the NSF Check did not affect the contemporaneous nature of the exchange of new value. We disagree.

Before addressing specifically the contemporaneous issue, we need to review § 547(c)(1) and the case law interpreting this provision in the context applicable here.

Section 547(c) provides defenses to an otherwise avoidable preference. For example,

The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1).

These types of transfers are protected by the Code "because, unlike payments to unsecured creditors, they do not affect the equality of distribution of estate assets." *O'Rourke v. Coral Constr., Inc. (In re E.R. Fegert, Inc.)*, 88 B.R. 258, 259 (9th Cir. BAP 1988) ("*Fegert I*") *aff'd Fegert II* (citation omitted).

■■■■ The § 547(c)(1) defense "is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *Lubman v. C.A. Guard Masonry Contractor, Inc. (In re Gem Constr. Corp. of Virginia)*, 262 B.R. 638, 645 (Bankr. E.D.Va.2000) (citations omitted). Thus, for § 547(c)(1) to apply, the value given for the transfer must actually enhance the worth of debtor's estate so as to offset the reduction in the estate caused by the transfer. *Id.*

■■■■ "To enjoy the benefits of Section 547(c)(1), the creditor must provide new value as defined in Section 547(a)(2) in contemporaneous exchange for the debtor's payments." *Fegert I*, 88 B.R. at 259.

**7.** The Judgments are arguably interlocutory because, although there was an FRCP Rule 54(b) certification, the bankruptcy court did not make the specific findings required under FRCP 54(b). *See Morrison–Knudsen Co., Inc. v. Archer*, 655 F.2d 962, 965 (9th Cir.1981) (the bankruptcy court should consider, under FRCP 54(b), whether an "appellate court will be required to address legal or factual issues that are similar to those contained in the claims still pending before the trial court").

However, we need not reach this question because, to the extent the summary judgment orders are interlocutory, we grant leave to appeal. *See* 28 U.S.C. § 1292(b); *Roderick v. Levy (In re Roderick Timber Co.)*, 185 B.R.

601, 604 (9th Cir. BAP 1995) (stating that we have discretion to grant leave to appeal). Specifically, this appeal involves a controlling question of law. As later explained, a substantial ground for difference of opinion exists on whether a payment to a subcontractor is avoidable as a preference when the surety was undersecured at the time of the transfer. Moreover, answering this question will materially advance the termination of this litigation because it will provide an appropriate framework for the bankruptcy court and the parties to resolve the underlying dispute. Finally, denying leave to appeal will result in wasted litigation and expense because the parties will likely return here for an answer.

"[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2). Before new value can be determined, a court must measure "the value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange." *Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 733 (9th Cir.1994) (quoting *Milchem, Inc. v. Fredman (In re Nucorp Energy, Inc.),* 902 F.2d 729, 733 (9th Cir.1990)); *see also Creditors' Committee v. Spada (In re Spada),* 903 F.2d 971, 976–77 (3d Cir.1990) (holding that a party invoking a § 547(c)(1) defense must "prove the specific measure of the new value given to the debtor" in exchange for what was received). New value is measured at the time of the transfer. *See Grand Chevrolet,* 25 F.3d at 733.

■ The party asserting a contemporaneous exchange defense "has the burden of proving that the parties intended the transfer to be a contemporaneous exchange for new value, that the exchange was in fact contemporaneous, and that new value was given." *Dye v. Rivera (In re Marino),* 193 B.R. 907, 913 (9th Cir. BAP 1996).

■ The payments made by a general contractor to subcontractors on public works projects [8] are typically exempted by the contemporaneous exchange exception of § 547(c)(1). *See Fegert I,* 88 B.R. at 260. In *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), the debtor was a construction company working on a bonded government construction project. After the debtor failed to make payments to subcontractors, the surety paid those debts. The bankruptcy trustee subsequently received final payment under the construction contract and held the construction funds for distribution to creditors. Later, the surety filed a complaint for turnover of the construction funds, alleging that the money was its property because it had paid the debtor's subcontractors. *Id.* at 133–35, 83 S.Ct. 232. The Supreme Court held that the surety had an equitable lien in the contract proceeds that was superior to the rights of the trustee. *Id.* at 141–42, 83 S.Ct. 232.

In *Fegert I,* the debtor contracted with the federal government to build a portion of a highway in Oregon. The debtor subsequently subcontracted portions of the work to other construction companies. After two subcontractors completed their work, the debtor failed to make timely payments. Therefore, the two subcontractors sued the debtor's surety to collect on the debtor's payment and performance

---

**8.** In Arizona, public works projects are governed by A.R.S. § 34–222, which is known as the "Little Miller Act" because it is patterned after the Miller Act, 40 U.S.C. §§ 270a–270d. Because the Little Miller Act reflects the Miller Act, Arizona courts view case law interpreting the Miller Act as persuasive authority. *See Ray Elec., Inc. v. Merchs. Bonding Co. (Mut.),* 758 P.2d 149, 150–51, 157 Ariz. 374, 375–76 (App.1988).

The Miller Act was enacted to protect the labor and materials suppliers in government construction projects. *See Continental Casualty Co. v. U.S.,* 305 F.2d 794, 797 (8th Cir. 1962) (citations omitted). It provides "subcontractors on government projects a security interest similar to that which they would have on private projects.... In effect, the Miller Act places subcontractors to government contractors on substantially equal footing with subcontractors to private contractors." *Fegert I,* 88 B.R. at 260 (citations omitted).

bond. The debtor then paid the subcontractors, and they released and dismissed their claims against the surety. *See Fegert I*, 88 B.R. at 258–59.

Less than 90 days after paying them, the debtor filed a bankruptcy petition. Responding to the chapter 7 trustee's preference action, the subcontractors moved for summary judgment based upon § 547(c)(1). The bankruptcy court granted the motion. *Id.* at 259.

On appeal, we relied on *Pearlman,* holding that the surety had an equitable right to contract proceeds that was superior to the right of the debtor's bankruptcy estate. We also relied on other circuit courts' holdings [9] that a secured creditor's release of a lien or security interest provides new value under § 547(c)(1). *Id.* at 259–60. The trustee did not dispute that the subcontractors had released their claims against the surety in return for payment. Therefore, we held that the subcontractor's release of their claims against the surety resulted in new value for the estate:

> If the Debtor had not made the payments to Coral and Shotwell [the subcontractors], then Seabord [the surety] would have been called upon to advance the funds and then exercise its lien rights against payments due or to become due to the Debtor. The Trustee does not dispute that the estate received post-petition more than the total paid to both subcontractors from the White River Road Contract. Since the Debtor's payments to the subcontractors avoided the imposition of an equitable lien by the surety on future payments under the contract, there was no diminution of the estate. Under these facts, the release of the subcontractors' rights against the surety, which in turn could have exercised its lien rights, constituted "new value" being given in a substantially contemporaneous exchange.

*Id.* at 260.

On further appeal, the Ninth Circuit affirmed. *See Fegert II*, 887 F.2d at 959. The *Fegert II* court held:

> We agree with the Fifth and Tenth Circuits [which held that a secured creditor's release of a security interest constitutes new value]. The payments to Coral and Shotwell are excepted. By paying the subcontractors, Fegert [the debtor] avoided Seaboard's automatic and equitable lien. This constituted "new value," and placed the payments within section 547(c)(1).

*Id.* at 959.

■ While releasing a fully secured interest may constitute new value, the release of an unsecured claim does not. In *Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.),* 59 F.3d 969 (9th Cir.1995), Powerine obtained a line of credit from various lenders and gave a blanket security interest to secure standby letters of credit that might be issued for the debtor. To ensure payment for crude oil, First National Bank of Chicago, one of the lenders, issued two letters of credit to Koch. Within 90 days of filing its bankruptcy petition, Powerine paid Koch $3.2 million for delivered oil. The creditors committee eventually initiated a preference action. *Id.* at 971.

The bankruptcy court held that § 547(c)(1) applied and granted Koch's motion for summary judgment. Koch argued that as in *Fuel Oil Supply,* the new value exception applied when the debtor paid the creditor because the bank's risk under the

---

**9.** Specifically, we relied on *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.),* 837 F.2d 224, 228 (5th Cir.1988) and *Kenan v. Fort Worth Pipe Co. (In re George Rodman, Inc.),* 792 F.2d 125, 127 (10th Cir.1986).

letters of credit was reduced by a like amount. That is "[t]he bank's contingent reimbursement claim against the debtor's assets was thereby released, giving the debtor new value." *Powerine Oil*, 59 F.3d at 973.

However, unlike the bank in *Fuel Oil Supply*, First National was only partially secured. "Only a portion of First National's contingent reimbursement claim was thus secured by the blanket lien." *Powerine Oil*, 59 F.3d at 973. Therefore, the amount of new value received by Powerine was limited to the secured portion of First National's reimbursement claim. *Id.* Regarding the unsecured portion of its claim, First National could not release a security interest on assets that did not exist. *Id.* at 973–74. Therefore, the court held that the contemporaneous exchange exception applied only to the secured portion of the debt. *Id.* at 974.

In *Newbery Corp. v. Fireman's Fund Ins. Co.*, 106 B.R. 186 (D.Ariz.1989), the debtor made payments to various subcontractors that worked on projects bonded by the debtor's surety. After filing a bankruptcy petition, the debtor sued its surety seeking to avoid the payments that it made to its subcontractors as an indirect preference. The bankruptcy court dismissed the claim. *Id.* at 186–87.

On appeal, the district court adopted our reasoning in *Fegert I*, but distinguished the matter before it from *Fegert I:*

> Newbery [the debtor] asserted that unlike *Fegert [I]*, some of the contracts bonded by Fireman's [the surety] were operating at a loss [at the time of the conveyance], resulting in a deficiency between the equitable lien the surety would have received had it made the payments itself, and the contract proceeds available to satisfy it. The court agrees. To the extent Fireman's preferences exceeded the amount of contract

proceeds that could have been released from an equitable lien, they would amount to the release of an unsecured indemnity claim against the estate. The release of unsecured indemnity claims do not constitute "new value" within the meaning of § 547(a)(2).

*Id.* at 187–88 (footnote and citations omitted).

Now that we have the legal framework to guide us, we turn to the Endo Payment. Debtor gave Endo the NSF Check and received an unconditional release of Endo's contingent claim against Continental and the Bond. After learning of the NSF Check, Endo refused to return to the Project until it received the Cashier's Check.

Trustee contends that because Endo signed an unconditional release on receipt of the NSF Check, the later acceptance of the Cashier's Check did not constitute a contemporaneous exchange for new value.

A.R.S. § 33–1008 governs the waiver of a lien in Arizona relating to "the construction, alteration or repair of any building, or other structure or improvement of any nature ...." 1992 Ariz. Sess. Laws Ch. 353 § 9. A.R.S. § 33–1008 provides for an unconditional waiver and release on the receipt of a progress payment. The unconditional waiver must include the following language:

> Notice: This document waives rights unconditionally and states that you have been paid for giving up those rights. This document is enforceable against you if you sign it, even if you have not been paid. If you have not been paid, use a conditional release form.

A.R.S. § 33–1008(D)(2).

▮▮▮▮ "Arizona's lien statutes are remedial and to be liberally construed to effect their primary purpose of protecting laborers and materialmen." *United Metro Materials, Inc. v. Pena Blanca Props.,*

*L.L.C.,* 4 P.3d 1022, 1027, 197 Ariz. 479, 484 (App.2000). "[T]he intent of the lien statutes is to insure to the laborer and the materialman payment of their accounts." *Id.* Nonetheless, a laborer may waive its lien. When a laborer releases its lien to get paid, a conditional waiver form is usually used because a conditional release only becomes effective if payment is actually received. If the laborer uses an unconditional lien waiver form, the lien release is effective immediately. *Id.*

The bankruptcy court held that Endo had a valid § 547(c)(1) defense. Implicit in its holding is a finding that the Endo Payment was a contemporaneous exchange for new value. This was error because Endo signed an unconditional waiver that provided the following notes: "This document waives rights unconditionally and states that you have been paid for giving up those rights. This document is enforceable against you if you sign it, even if you have not been paid. If you have not been paid, use a conditional release form." Unconditional Waiver and Release on Progress Payment (April 14, 1994).

Endo contends that it should not be held to its waiver at the time that it signed the unconditional release because it did not receive consideration until it obtained the Cashier's Check. Endo cites *United States ex rel. Youngstown Welding & Eng'g Co. v. The Travelers Indem. Co.,* 802 F.2d 1164 (9th Cir.1986), in support of its argument. There, in a public works case governed by the Miller Act, the court looked to state law to determine whether a lien release was valid.[10] The court stated that "[u]nder Arizona law a release must be supported by consideration." *Id.* at 1167 (citation omitted).

However, when *Youngstown* was decided, Arizona case law required that consideration be provided. *See Youngstown,* 802 F.2d at 1167 (citing *State Farm Fire & Casualty Co. v. Rossini,* 482 P.2d 484, 488–89, 14 Ariz.App. 235, 239–40, *vacated* 490 P.2d 567, 107 Ariz. 561 (1971)). After the *Youngstown* decision, Arizona enacted A.R.S. § 33–1008. Therefore, A.R.S. § 33–1008 controls our inquiry. *See Wolfson v. Watts (In re Watts),* 298 F.3d 1077, 1083 (9th Cir.2002) (holding that an intervening change in state law allowed a result that would otherwise be inconsistent with a prior Ninth Circuit decision).

Endo's lien release was an unconditional waiver that complied with A.R.S. § 33–1008(D)(2). Consequently, we must give effect to the waiver. *See United Metro Materials,* 4 P.3d at 1027–28 (stating that a waiver that comports with the statutory forms is valid); *see also Ash v. Egar,* 541 P.2d 398, 401–02, 25 Ariz.App. 72, 75–76 (1975) (contracts should be given their plain meaning). As such, Endo waived its claim against Continental and the Bond even though the NSF Check was dishonored. Because Endo's lien release was effective immediately, the issue is whether the later substitution of the Cashier's Check constituted a "contemporaneous exchange" for new value under § 547(c)(1).

Endo has the burden to show that 1) the parties intended the transfer of new value to be contemporaneous, 2) the exchange was in fact substantially contemporaneous, and 3) new value was given. *See Marino,* 193 B.R. at 913.

Trustee contends that Debtor did not intend for the Cashier's Check to be exchanged for new value. Rather, Debtor

---

**10.** Apparently, the *Youngstown* court turned to state law since "neither the Miller Act nor any other federal law provides standards, apart from the requirement of clarity, for determining what constitutes a valid release .... " *Youngstown,* 802 F.2d at 1167 (citation omitted).

intended for the Cashier's Check to replace the NSF Check. In support of his position, Trustee cites *Hall–Mark Elecs. Corp. v. Sims (In re Lee),* 179 B.R. 149 (9th Cir. BAP 1995).

There, a creditor sold goods to the debtor. In return, the debtor issued a check to the creditor, which was dishonored because two signatures were required on the check. The day the check was returned, the creditor stopped shipping goods to the debtor. The debtor then obtained a cashier's check, which it sent to the creditor. After the debtor filed a bankruptcy petition, the trustee filed a preference action against the creditor. *Id.* at 153. The creditor asserted a § 547(c)(1) defense. Because "there was no evidence of intent for the Cashier's Check to be other than a replacement of the previously dishonored Check," the bankruptcy court avoided the transfer. *Id.* at 154–55.

On appeal, we affirmed. We held that a contemporaneous exchange defense "cannot involve a dishonored check." *Id.* at 163 (citations omitted). In reaching this conclusion, we relied on the legislative history of § 547(c)(1). "Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment *unless the check is dishonored.*" *Id.* (quoting legislative history). We reasoned that "[d]ishonor changes the nature of the transaction from one intended for a contemporaneous cash exchange to a credit transaction." *Id.* (citations omitted). We further indicated that the parties intent was critical because the statute requires that the parties intend the exchange to be for new value. The creditor "did not [intend to] give new value for the promise to make the dishonored check good." *Id.* Rather, the creditor intended that the cashier's check would replace the dishonored check. *Id.*

Here, the bankruptcy court rejected Trustee's contention.

This court concludes that such assertion is incorrect when dealing with transfers shielded by the equitable lien doctrine of Pearlman and its progeny. Because the triggering elements that protect payments/transfers on bonded construction projects are the transfer/payment and the contemporaneous release of the equitable lien of the surety, the otherwise valid exclusion of dishonored checks from being a contemporaneous exchange does not apply to transfers involving bonded construction projects which met the equitable lien doctrine's requirements.

Minute Entry/Order For Matter Taken Under Advisement (Nov. 5, 2001), 3. We disagree.

When the NSF Check was dishonored by the bank, Endo sent a demand letter to Debtor, which stated: "This is to notify you that effective *immediately* ENDO STEEL, INC. will be vacating the jobsite due to a progress payment check bouncing. We will not return to the jobsite until all the check is made good with a certified cashiers [sic] check." Letter from Cindi Werlinger to JWJ Contracting Co., Inc. (April 20, 1994). In response to the demand letter, Debtor obtained and delivered the Cashier's Check.

Debtor did not give Endo the Cashier's Check in exchange for Endo's release, which, as explained above, had already occurred when the unconditional waiver release form was signed. Debtor simply complied with Endo's request, which was to provide Endo with the Cashier's Check to replace the NSF Check. Therefore, the substitution of the Cashier's Check was not a contemporaneous exchange for new value. Rather, a credit transaction occurred, and new value was not given for

the unconditional release. *See Lee*, 179 B.R. at 163.

Accordingly, the bankruptcy court erred in granting the Endo Motion and denying the Endo Cross Motion because a preferential transfer occurred (not contested by Endo) and Endo did not have a valid § 547(c)(1) defense.[11]

B. *The Bankruptcy Court Erred in Granting the Marco Motion and Denying the Marco Cross Motion.*

▇▇ The bankruptcy court granted the Marco Motion and denied the Marco Cross Motion. On appeal, Trustee contends that the bankruptcy court erred in denying the Marco Cross Motion because he proved each element of a preference and Marco did not present a viable § 547(c)(1) defense.

In connection with the Marco Cross Motion, Trustee provided the bankruptcy court with evidence that Marco had admitted that it was a prepetition creditor of Debtor that received a transfer of Debtor's property within 90 days of Debtor's petition. Trustee further showed that the Marco Payment allowed Marco to receive more than a chapter 7 general unsecured creditor.

Marco did not controvert any of these facts. Rather, Marco argued that it had a new value defense under § 547(c)(1).[12] Because Marco did not controvert the core preference elements, we turn to its defense.

Again, Marco has the burden of proving that 1) the parties intended the transfer to be contemporaneous, 2) the exchange was in fact substantially contemporaneous, and 3) new value was given. *See Marino*, 193 B.R. at 913.

Trustee contends that Continental was undersecured on the Project on the date of the Marco Payment.[13] Trustee declared that "Continental's Equitable Lien on proceeds of the Primary Contract was undersecured by more than $1.2 million as of April 13, 1994." JWJ Trustee's Statement of Disputed Facts (Oct. 22, 2001), at Exhibit A, 2. Trustee's statement was based on his expert's report which stated that "[n]o portion of the Transfer could possibly have resulted in a reduction of the surety's equitable lien on job contract proceeds." Statement of Facts in Support of Motion for Summary Judgment Against Marco Crane (Oct. 30, 2001), at Exhibit 2, 9.

In response, Marco argued that the Marco Payment was given in exchange for a lien release against the Bond. The re-

11. Because we conclude that the bankruptcy court erred in granting the Endo Motion and denying the Endo Cross Motion, we need not decide Trustee's argument that Continental was undersecured at the time of the Endo Transfer. However, the same analysis that applies to the Marco Payment would apply to the Endo Payment.

12. The bankruptcy court did not make any express findings relating to Marco at the hearing on the Marco motions. The bankruptcy court simply granted the Marco Motion and denied the Marco Cross Motion based solely upon Marco's assertion of a § 547(c)(1) defense.

13. The Subcontractors object to our consideration of most of the documents included by

Trustee in the Record supporting this contention. According to the Subcontractors, these documents were not submitted to the bankruptcy court in connection with these matters. Specifically, the Subcontractors object to our considering the documents found at Tabs 1, 5, 6, 7, and 21 of Appellant's Excerpts of Record. However, the Record reveals that Trustee referenced these documents in pleadings and presented them to the bankruptcy court. Accordingly, we will consider this material. *See Smyrnos v. Padilla (In re Padilla)*, 213 B.R. 349, 354 n. 3 (9th Cir. BAP 1997) ("[a]n appellate court may ... consider evidence ... presented to the trial court which is thus ... part of the record on appeal").

lease provided that Marco "has been paid and has received a progress payment in the sum of $33,800.81 [14] for all labor, services, equipment or material furnished to the jobsite or to JWJ Contracting Co. Inc. . . . and does hereby release any mechanic's lien, [or] any . . . bond right . . . ." Unconditional Waiver and Release (April 12, 1994), at 1. According to Marco, "[i]t is undisputed that between $767,000 and $1.3 million was actually disbursed to JWJ and/or Continental after April 13, 1994." Marco Crane's Controverting Statement of Facts in Opposition to Trustee's Motion for Summary Judgment (Dec. 3, 2001), at 5.

Here, Trustee seeks to have us draw a bright line that applies *Fegert II* only when the surety is fully secured. Admittedly, *Fegert II* does not address whether at the time of payment to the subcontractors the surety was fully secured. The court finds that the estate received postpetition payments on the project that exceeded what was paid to the subcontractors. Therefore, *Fegert II* does not answer the question what happens if at the time of payment outstanding subcontractor claims exceed payments payable on the project.

In *Gem Constr. Corp.*, the bankruptcy court considered all matured claims against the bond to determine if the surety was fully secured. *See Gem Constr. Corp.*, 262 B.R. at 650–52. There, the debtor hired Stovall to work on a bonded construction project. After completing work, Stovall was not fully paid. It therefore filed suit against the surety and the debtor. In response, the debtor paid Stovall $81,874 in exchange for a lien waiver and dismissal of the lawsuit. The debtor was owed $120,000 under the construction con-

tract while owing other subcontractors about $172,000. *Id.* at 643–44. However, Stovall was the only subcontractor to demand payment. Therefore, the bankruptcy court viewed the other subcontractor claims as contingent. *Id.* at 650–51. Accordingly, the bankruptcy court found that Stovall's claim was fully secured. *Id.* at 652.

Relying upon *Fegert I* and *Newbery*, the bankruptcy court reasoned that although

> [a]t the time of the transfer, [the] debtor owed the other subcontractors $172,958.08, but Markel [the surety] did not have any liability for those debts because the other subcontractors had not made a claim on the bond. Thus, at the time of the transfer, Markel could have paid Stovall [the subcontractor] and would have been fully secured on the $81,874.00 payment to Stovall. Restated, the subcontractor had a matured claim against the surety bond . . . .

*Id.* at 651–52 (footnote omitted). Although later claims made against the bond exceeded funds payable to the debtor, the bankruptcy court concluded that "the relevant inquiry is the unpaid amount of the surety's contingent claims that have *matured* into actual liabilities at the time of the transfer." *Id.* at 651 (emphasis added).

Therefore, in applying *Fegert II*, the appropriate focus is whether the contingent claim of the surety is fully secured. If not, the release of the subcontractor's claim against the bond results in new value for the debtor only to the extent that the surety is secured. Here, when Marco released its lien, we do not know if Continental was fully secured by Contract proceeds to be paid. Undisputedly, the City paid over $767,000 to Debtor after the Marco

---

**14.** According to Marco, it received a progress payment of $37,030.52 despite the $33,800.81 amount stated in the release.

Payment. Nevertheless, the Record is unclear as to whether other outstanding claims had matured against Continental that would cause Continental to be undersecured at the time of the Marco Payment.[15]

This approach is also dictated by *Powerine Oil Co.* As previously discussed, the Ninth Circuit clearly held that new value arises only to the extent that the released claim is secured. *See Powerine Oil Co.*, 59 F.3d at 973. Therefore, on remand, it is important for the bankruptcy court to determine the extent to which Continental's contingent claim against Debtor was secured. To do that, the bankruptcy court should determine at the time of the Marco Payment the amount of mature claims of subcontractors on the Project and compare that number to the amount of Contract proceeds remaining to be paid on the Project. The bankruptcy court will then be able to assess whether Continental was fully or partially secured on its contingent claim when the Marco Payment was made. This will allow the bankruptcy court to calculate the amount of new value provided to Debtor when Marco released its claim against the Bond.

Therefore, we reverse the grant of the Marco Motion and remand to the bankruptcy court for further proceedings.

C. *The Bankruptcy Court Erred in Denying the Reconsideration Motion.*

The bankruptcy court denied the Reconsideration Motion.[16] On appeal, Trustee does not assign specific error to the bankruptcy court's denial of the Reconsideration Motion. Rule 9023 makes FRCP 59(a) applicable in bankruptcy cases, which provides that:

[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

FED. R. CIV. P. 59(a).

Granting a motion for a new trial under FRCP 59(a)(2) is appropriate if the moving party demonstrates 1) a manifest error of fact; 2) a manifest error of law; or 3) newly discovered evidence. *See Brown v. Wright*, 588 F.2d 708, 710 (9th Cir.1978).

As stated above, the bankruptcy court erred when it granted the Endo Motion. Therefore, the bankruptcy court erred in denying the Reconsideration Motion.

## V. CONCLUSION

In sum, the bankruptcy court erred in granting the Endo Motion because Endo

---

15. It appears from the appellate record that JWJ made a payment of $750 to another subcontractor on the date of the Marco Payment. While Trustee indicated that there might be additional payments to other subcontractors on that day, he has failed to indicate whether there were other outstanding claims against Continental on the day of the Marco Payment.

16. In the Reconsideration Motion, Trustee asserted that the bankruptcy court erred in granting summary judgment to Endo. Trustee did not contend that the bankruptcy court erred in granting summary judgment to Marco.

released its claim against Continental prior to receiving the Cashier's Check; and the Cashier's Check was not exchanged for new value. Similarly, the bankruptcy court erred in denying the Endo Cross Motion because a preferential transfer occurred and Endo had no valid § 547(c)(1) defense.

The bankruptcy court erred in granting the Marco Motion because it made no determination regarding the extent to which Continental was secured when the Marco Payment was made and Marco released its claim against Continental.

Finally, the bankruptcy court erred in denying the Reconsideration Motion because it erred when it granted the Endo Motion.

REVERSED and REMANDED.